## PACIFIC GAMBLE ROBINSON CO. v. MINNEAPOLIS & ST. LOUIS RY. CO.

### Civ. 3004.

United States District Court
D. Minnesota, Fourth Division.
March 17, 1952.

Perry R. Moore, Floyd E. Nelson, and James B. Hannah, of Minneapolis, Minn. (Stinchfield, Mackall, Crounse & Moore, of Minneapolis, Minn., of counsel), for plaintiff.

Richard Musenbrock, of Minneapolis, Minn., C. W. Wright and William J. Powell, of Minneapolis, Minn., of counsel, for defendant.

NORDBYE, District Judge.

Plaintiff, a Delaware corporation, is engaged in the distribution of perishable fruits, vegetables and groceries. Its operations are carried on through many branches between the West Coast in the United States and eastern Canada, including a branch at Minneapolis. The Minneapolis branch consists of two warehouses, one located at 301 North Fifth Street, hereinafter called the Fifth Street branch, and 200 North Sixth Street, hereinafter called the Sixth Street branch. These two warehouses sometimes will be referred to as the Minneapolis plant in that they are in close proximity to each other. The Fifth Street branch building is owned by defendant and leased to plaintiff. Defendant also owns and maintains the only switch tracks which serve both warehouses. In carrying on its operations, plaintiff has for many years used defendant's switching services for cars in and out of the Minneapolis plant for line haul on defendant's line as well as for shipments which are to proceed over lines of connecting carriers.

On March 10, 1949, the truck drivers, helpers and loaders at plaintiff's Minneapolis branch went out on strike. The strike, however, did not involve any other branch in this state or adjacent states. Between March 10 and March 28, 1949, defendant furnished switching service to the Minneapolis plant from time to time upon request of plaintiff. However, on or about March 11th, when some of plaintiff's non-striking employees were attempting to load a freight car with perishable vegetables, the strikers or their sympathizers interfered through force and violence with such operations and damaged and destroyed a substantial part of the merchandise which was being loaded or attempted to be loaded in the freight car. Moreover, there was at this time so-called mass picketing around the Minneapolis plant. Thereafter, on March 14th, plaintiff obtained an order from the Hennepin County District Court restraining the Union

and its members from any illegal acts, including the following,

"(a) Seizing or occupying and controlling or threatening to seize, occupy or control the railroad car and railroad facilities and trackage at plaintiff's railroad dock located at and adjacent to its building at 301 North Fifth Street, Minneapolis, Minnesota."

"(e) Seizing and obstructing and interfering with the free and uninterrupted use of plaintiff's methods of transportation or conveyance."

"(k) Taking from any vehicle or railroad car, or otherwise interfering with, any of plaintiff's merchandise or property placed in or about to be placed in transit in interstate commerce."

"(l) Interfering in any way with the loading by plaintiff's employees of plaintiff's perishable merchandise now in plaintiff's warehouse into freight cars or trucks at plaintiff's docks and facilities at said 301 North Fifth Street."

This restraining order remained in full force and effect at all times material herein, and there is no evidence of any violence or interference thereafter on the part of the strikers with the switching of cars to and from plaintiff's railroad dock, or any interference with the loading of such cars with the non-striking employees of plaintiff. Pickets were limited by the District Court's order to not more than two at each entrance of the building, and apparently the order in that regard was obeyed.

During the morning of March 28, 1949, defendant, in conformance with the prior request of plaintiff, moved in ten empty freight cars onto the switching track of the Fifth Street plant. The purpose was to move out of the plant all of the perishable merchandise and transfer it to the other branches of the plaintiff before the merchandise deteriorated and became worthless. Two of the cars were loaded by March 29th, when defendant was requested to switch them out for movement to Mankato, Minnesota and Eau Claire, Wisconsin. Defendant's switch crew on the afternoon of March 29th, in charge of one Morrell,

the switch foreman, proceeded to carry out this order. The engine stopped at what is designated as the crossing near the west side of the Fifth Street warehouse. At that time, in accordance with the custom and practice in proceeding with this movement, Morrell was on the ground. At that time, an unidentified man came up to him and asked him where he was going. Morrell testified that, "We told him we were up here to take out two cars, two loads, and I want to know if the order held good that we had before." In explanation of what he meant by the "order", the witness replied that the Union on strike had given orders permitting the railroad to move cars from the struck plant and Morrell wanted to know if the "order still held." This inquiry led to another unidentified man stating to Morrell, "Don't move a car. That order is no good." Thereupon, Morrell called his superior for instructions. Before further instructions were given to Morrell, his quitting time arrived and the entire switch crew departed. Later that day, Morrell's superior, Manatt, defendant's local freight agent, communicated with Mr. Clark, the Assistant General Superintendent of defendant, and in charge of switching operations in this area. Clark communicated with a Mr. Carlson, who was the general chairman of defendant's switching Union, and Carlson was asked to "call on this organization that were on strike there and get permission from them to let us pull the cars." Later, Carlson informed Clark that the striking Union would permit the loaded cars to be moved upon condition that the remaining eight empties be also moved. No objection was made by defendant to the condition imposed by the Union, and without informing plaintiff of the arrangement, proceeded to pull out the ten cars. Protest was immediately made by plaintiff and a demand was made for the return of the eight cars. On March 30, 1949, a written demand was made for the return of the eight empties to the Fifth Street warehouse track "or any other eight empties promptly switched and spotted as above." No response was made by defendant to this request for car service. On April 8, 1949, plaintiff made a written demand for one

empty refrigerator car to be spotted for a loading of merchandise at the Sixth Street warehouse. The car never was received. On April 16th, plaintiff applied to this Court for a mandatory injunction requiring defendant to furnish railroad cars for plaintiff's use. On April 27th, this Court granted plaintiff's motion. On April 29th, judgment was entered and a writ of injunction issued. See 83 F.Supp. 860. The writ of injunction required defendant to furnish and provide refrigerator and other cars, switching services and railroad transportation to plaintiff upon its request therefor and to move any and all of said cars in and over defendant's Minneapolis switching tracks to the loading docks at plaintiff's Fifth and Sixth Street plants.

On April 30, 1949, plaintiff wrote a letter to defendant requesting eight refrigerator cars and specifically informed defendant as to the commodities to be hauled and where the cars were to be spotted on the loading track. Neither the requests made by plaintiff nor the mandatory injunction of this Court was complied with. On May 9, 1949, defendant made a motion to stay the force and effect of the writ. Intervention was made by certain employees of the defendant who joined in the motion to dismiss the injunction. This motion was denied. Later, an appeal was taken by defendant from the order granting the temporary injunction. Contempt proceedings were instituted by plaintiff against defendant and one or more of its officers, but by reason of the pendency of the appeal, the Court continued the application for an order of contempt. On May 12, 1950, the Court of Appeals dismissed the appeal, Minneapolis & St. Louis Railway Co. v. Pacific Gamble Robinson Co., 8 Cir., 181 F.2d 812, upon the ground that the question presented on appeal—the propriety of the temporary mandatory injunction—was moot because plaintiff's employees had ended the strike and defendant had commenced to furnish the cars required by plaintiff on or about June 19, 1949.

After the decision rendered by the Court of Appeals on the appeal from the issuance of the temporary injunction, defendant moved to dismiss the mandatory injunction action including the civil contempt proceeding upon the ground that all proceedings now were moot. Defendant's motion was granted and the action for a mandatory injunction, including the contempt order, was dismissed. 92 F.Supp. 352. Later, this Court amended its order so as to permit plaintiff to file a supplemental complaint in the mandatory injunction proceeding so as to present the question of damages which plaintiff claimed by reason of defendant's failure to furnish car service during the period in question in alleged violation of defendant's statutory and common law duty. A supplemental complaint in accordance with the amended order was thereafter filed. Issues were joined and this matter is now before the Court for determination.

That the Court has jurisdiction of this controversy seems clear. Diversity of citizenship exists, and the amount in controversy exceeds $3,000 exclusive of interest and costs. Reference may be made to the pertinent statutes which seem to remove any doubt in this regard. The applicable provisions of the Interstate Commerce Act are to be found in Title 49, U.S.C.A. Section 8 of Title 49 provides,

"Liability in damages to persons injured by violation of law. In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

Section 1 (4) provides,

"It shall be the duty of every common carrier subject to this chapter engaged in the transportation of passengers or property to provide and fur-

nish such transportation upon reasonable request therefor, * * *."

Section 1(3) defines "transportation" as used in Section 1(4), and Section 1(11) provides,

"It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service * * *."

Section 1(10) defines "car service" as used in Section 1(11) as follows,

" 'Car service' defined. The term 'car service' in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter."

And Section 9 expressly vests jurisdiction in this Court as follows,

"Remedies of persons damaged; election; witnesses. Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt."

■ It will be observed that in Section 9 above, complaint may be made to the Commission, or suit may be brought to recover damages. Defendant urges that the Commission has exclusive jurisdiction of this controversy. But in maintaining that position it seems evident that it is clearly untenable. We are not concerned with any technical or administrative matter which requires interpretation by the Commission. Nor is there any need to resort to the facilities which the Commission may have to investigate and determine certain administrative questions. Here, the Commission has no superior knowledge of the questions involved. The problem as to the extent of the duty to furnish cars under the circumstances herein and whether a violation has occurred presents a judicial question. Chicago, R. I. & P. Ry. Co. v. Lawton Refining Co., 8 Cir., 1918, 253 F. 705; Butler Motor Co. v. Atchison, T. & S. F. Ry. Co., 8 Cir., 1921, 272 F. 683; Atchison, T. & S. F. Ry. Co. v. United States ex rel. Sonken-Galamba Corp., 8 Cir., 1938, 98 F.2d 457; Great Northern R. Co. v. Merchants Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.

■ At the outset, it seems clear that, upon reasonable request, the duty rested upon defendant to furnish cars for switching service to plaintiff. The only switching tracks which entered plaintiff's premises were those of the defendant railway company. And in order to make railroad shipments over defendant's lines, or any connecting carrier, plaintiff was dependent upon defendant for the furnishing of railroad cars. It is recognized, of course, that this duty is not absolute, and the primary question involved in these proceedings is whether or not defendant under the facts was excused from serving plaintiff on its demand for cars, or as defendant frames the question in its brief, "Do the facts pleaded and proven by defendant constitute an excuse?" Defendant bases its excuse upon the fact that its trainmen were fearful of the consequences if they performed the usual switching service into and on plaintiff's premises, and therefore they refused to do so. Consequently, defendant contends that it used due and bona fide measures to enlist the aid of its own employees to perform this switching service, but that none of its employees would carry out these orders. Defendant also established that it posted notice in several places by which it called for volunteers to perform such switching service. Moreover, it contends that its supervisory forces refused to perform the services for the same reasons as given by its employees.

An analysis of the evidence must be made in order to determine whether or not there is substance to defendant's excuse in this regard, and in order to ascertain whether the excuse proffered relieves defendant from its duty, a somewhat detailed consideration of the evidence seems necessary. It is reasonably clear from the evidence that, from the inception of the strike, the officials of the railway company were determined to avoid any friction with the striking Union. They determined that any movements of cars onto the tracks which served the plaintiff company should not be made after the strike was called until permission was granted by the striking Union. In other words, the furnishing of cars to the plaintiff was to be subject to the grace of the leaders of the strikers. This is apparent from the evidence, although there were no threats of violence manifested towards the railroad employees by the strikers. In addition, there apparently was apprehension as to whether any friction might have repercussions whereby the drivers of vehicles handling defendant's L. C. L. shipments might be affected. This would seem to appear from the testimony given by Mr. Devins, the General Superintendent of defendant, on May 16, 1949, when he testified on the motion to vacate the mandatory injunction. In response to the question,

"In your affidavit you speak of a possible prejudice to other patrons of the M. & St. L. Railway in the Minneapolis district in the event that the present conditions at Gamble Robinson's continue, and the railway gets into difficulty with its employees over service to Gamble Robinson. What do you mean by that?" (p. 30, Record) he answered,

"Early in the difficulty we encountered here in switching operations to the Gamble Robinson Company, I personally contacted an officer of this Drivers' Union 544 in an effort to find out if there wasn't some way so we could proceed without friction and perform that service. In the course of conversation with that individual, I was advised that the drivers of the vehicles that serve our Minneapolis freight station and our team tracks were generally members of their Union, and upon my inquiry to him as to whether or not these people might become involved in the strike if we performed this service with friction, he stated my guess was probably as good as his, that he couldn't answer my question specifically and wouldn't. But I was of the opinion that the possibility and probability was there, and if the other truck drivers went out on strike, or not exactly on strike, just refused to drive their vehicles to and from our freight station or our team tracks, that a great many patrons would be thereby adversely affected and the railroad of course practically paralyzed in respect of handling L. C. L. tonnage in the Twin Cities and carloads as well as on its team tracks. We therefore formed a conclusion that we would like to avoid any such situation." (pp. 30–31, Record)

In any event, whatever may have prompted the attitude of the officials of the defendant company in concluding that no cars should be moved onto defendant's loading track without the consent of the striking Union, it is evident that the switchmen who handled the switching of cars in this area were aware of the attitude of their superiors and they knew that their superiors were recognizing the strikers' wishes and demands with reference to the type and amount of car service which should be given to plaintiff. This seems evident because when Morrell, the switch foreman, came to plaintiff's plant on March 29th, he inquired of the group of men standing near the crossing a short distance from plaintiff's Fifth Street plant whether "the order was still in effect." This, of course, referred to the order issued by the Union to its members that there should be no interference with train movements into the Gamble Robinson plant. Later, the next day, when the railroad company acceded to the demands of the Union that the loaded cars should only be moved upon condition that the eight empties be taken out, it was inevitable that the employees of the railroad company would not assume to perform

switching services for plaintiff when they knew that such movements would be contrary to the policies theretofore adopted and followed by their superior officers. Obviously, therefore, when the defendant acceded to the Union's demand that the eight empties should be removed from plaintiff's loading dock and orders were given to the switching crew to proceed accordingly, any orders thereafter by the officials to the trainmen to perform switching service were nothing more than lip service to the duty which the statute imposed, as well as the injunction order thereafter issued by this Court. That is, in view of what had occurred between the officials of defendant and the officials of the striking Union, it was to be expected that the subordinate railroad employees would demur to any apparent orders given for car service to plaintiff.

When the trainmen took the witness stand and were asked whether or not they would participate in any switching movement to plaintiff's plant, they all repeated substantially the same statement which was to the effect that they would refuse to handle any switching to plaintiff's plant because of the fear of violence to themselves and families. However, they did not refer to any threats of violence or any activities of the strikers which would lead a reasonable person to believe that there would be violence or reprisals if they performed their duty. And the evidence is barren of any acts or conduct of the strikers which form any basis for such fear. They conceded that, as members of a railway union, they were not required to recognize the picket line of the teamsters' union on strike. It seems quite evident that these men in stating that they refused to switch cars into this plant merely reflected the known attitude of their superiors; that is, without the striking Union's consent, no switching service would be given. And when orders were given by the superiors to the switch crew, they well knew that they were not expected to obey any orders given in ostensible compliance with defendant's statutory duty or with the Court's mandatory injunction. It must be emphasized that there is an absence of any persuasive showing in the record which justifies the alleged fear and apprehension that defendant's trainmen expressed as the reason why they refused to move cars onto plaintiff's loading dock. In commenting upon defendant's objection to plaintiff's application for the temporary mandatory injunction when it was declared by defendant that the railway company's crews would refuse to pull the cars or deliver cars to plaintiff, this Court stated in referring to the statements of the switching crew in that regard,

> "Such testimony, standing alone, does not establish the danger of intimidation or threat of danger, and certainly this Court cannot and will not presume that men who represent themselves as responsible leaders of a responsible Union would advise or permit men whom they represent to commit irresponsible acts of intimidation or violence against men subject to an injunction which this Court stands ready to enforce. To presume such is to assume the irresponsibility of this Union which is now on strike and a lack of discipline within their ranks."

Reference may be made to the testimony taken on May 16, 1949, on the hearing of defendant's motion to vacate the temporary injunction. Mr. Devins, the General Superintendent, at that time testified,

> "I testified here that as far as I know there have been no threats of any kind or any outward appearance of danger. But I can again state that is not the proof that danger does not exist." (p. 56, Record)

And in response to the Court's question,

> "Well, now, Mr. Devins, you have been talking about hazard; you have been talking about danger. What hazard, what danger, do you anticipate or the men anticipate in going down there and performing your duties as a common carrier. What is the hazard?" (p. 53, Record)

he stated,

> "I think myself—I cannot talk for these other men, but for myself I think there is an opportunity for the single members perhaps of that organization

to create a reprisal on me personally. * * *" (p. 53, Record)

And in response to the Court's question,

"What has given rise to this state of fear that apparently has come into your mind and the minds of some of your employees? What has 544 done in this strike that would lead you to believe that there would be reprisals and personal violence?" (pp. 53-54, Record)

he answered,

"Your Honor, I wouldn't know. They haven't done anything to my knowledge. But here is a group of responsible citizens, some eighty people, who positively refuse to comply with the request on the ground that their personal safety is involved. They may know a lot more than I do, but I am led to the conclusion that there must be—where there is smoke there is fire, and there must be something that has passed, maybe in the air and intangible, but anyhow there must be some grounds for that conclusion on their part." (p. 54, Record)

■ The undeniable fact is that the railroad company took no affirmative steps whatsoever to comply with its duty as a common carrier, and did nothing to insist and demand that the strikers should not interfere with the performance of that duty. It is not necessary here to determine the extent that a carrier must go in order to relieve itself of dereliction in fulfilling its statutory duty when confronted with strike conditions in an industry which it serves. Suffice it to say that the showing here reflects an absence of any bona fide attempt to comply with the carrier's duty. Certainly, the question of rendering switching service by a carrier is not to be determined by the grace of the Union which is on strike in one of the industries that the railway company under the law is required to serve. The Court is not unmindful that the striking Union was concerned with any attempt on the part of plaintiff to move the perishables from the plant, and thereby relieve some of the economic pressure that the strike was causing. And the Court also recognizes that there have been instances—too many indeed—where strikers have committed violence in attempting to prevent anyone from moving goods from a strike-bound plant. But surely we have not reached a situation in this country where a common carrier must capitulate abjectly when a striking Union merely makes known to it that it desires that the carrier refrain from rendering such service. Here, the defendant carrier, notwithstanding its common law and statutory duty, notwithstanding the mandatory injunction of this Court, notwithstanding the absence of any violence or threats of violence or reprisals on the part of the strikers, notwithstanding there was no contract between the railroad Union and the striking Union whereby the railroad Union would respect the picket line of the strikers, notwithstanding the failure of the railroad even to seek the aid of the police in furnishing protection if needed, or of this Court in issuing appropriate orders to prevent violence or reprisals in aid of its injunction, meekly bowed to the wishes and demands of the striking Union. The duty which rests upon a common carrier cannot be so lightly thrust aside. Instead of attempting to obey the law of the land, the defendant assumed to consider the wishes and the demands of the striking Union as being paramount. To condone defendant's failure to perform its statutory duty under this evidence would be tantamount to recognition that mob rule had supplanted law and order in this community. Such an assumption is not justified by the evidence. The Court concludes, therefore, that the record will not sustain defendant's contention that it was excused from complying with its duty to furnish railroad cars to the plaintiff during the period in question. Reference may be made to the following cases which are helpful: Burgess Bros. Co. v. Stewart, 1920, 112 Misc. 347, 184 N. Y.S. 199; Burgess Bros. Co. v. Stewart, 1921, 114 Misc. 673, 187 N.Y.S. 873; Buyer v. Guillan, 2 Cir., 1921, 271 F. 65, 16 A.L.R. 216; Burlington Transportation Co. v. Hathaway, 1943, 234 Iowa 135, 12 N.W.2d 167, 149 A.L.R. 1238; Consolidated Freight Lines v. Department of Public Service,

1939, 200 Wash. 659, 94 P.2d 484; Northwestern Pacific R. Co. v. Lumber & Sawmill Workers' Union, Cal.Sup., 1948, 189 P. 2d 277.

Defendant questions the sufficiency of the orders for cars by plaintiff in view of the provision of its published tariffs. The tariff or tariffs involved during the period in question required that orders for cars must be given (or filed) with the originating carrier's agent a reasonable time in advance and that it should specify (1) the type of cars desired; (2) the commodities to be loaded; and (3) the character of carrier service desired. Concededly, the letter of April 30, 1949, from plaintiff to defendant complied strictly with these provisions. This letter reads,

"Gamble-Robinson Company
Minneapolis, Minnesota
April 30, 1949
"The Minneapolis & St. Louis Railway
Company
Northwestern Bank Building
Minneapolis, Minnesota
"Gentlemen:

"We hereby request that you furnish us at this time with 8 refrigerator cars, 7 of which are to be pre-iced and the other a dry refrigerator car. In the pre-iced cars, we expect to load 5 cars of apples and the other 2 pre-iced cars will be loaded with vegetables and mixed grocery items. In the dry refrigerator car we expect to load mixed grocery store items. These commodities will require protective service.

"We also request to be furnished with 2–40′ common box cars which we will load with mixed grocery store items.

"We request that 5 of said cars be spotted in a position for loading on the switching track immediately adjacent to our loading doors at 301 North Fifth Street, Minneapolis, Minnesota, and the remaining 5 cars are to be spotted on the switching track parallel to the aforesaid switching track and in the position for platform loading through the car, or cars, on the track immediately adjacent to our building.

"In order that we may move our more perishable goods first, we request that one common box car be placed on the north end of each string of five cars.

"Your line is to be the originating carrier of these cars, the destinations of which are Waterloo, Iowa; Fort Dodge, Iowa; Mason City, Iowa; Estherville, Iowa; Sioux Falls, South Dakota; Omaha, Nebraska; Lincoln, Nebraska; and Aberdeen, South Dakota. One or more cars will be shipped to each of these points.

"We will be ready to load said cars Monday morning, May 2nd, at 8:00 a. m.

"Yours very truly,
Gamble-Robinson Company
By E. G. Holmes
Traffic Manager"

Moreover, defendant is not now in a position to question the sufficiency of the oral order with which it complied when it placed ten cars on plaintiff's loading track prior to March 29, 1949. When defendant on that date removed eight empty cars before plaintiff had had an opportunity to load them, it acted contrary to plaintiff's instructions. When plaintiff wrote the letter of March 30, 1949, and demanded the return of these cars, it was not necessary for plaintiff again to specify an order which was strictly in compliance with the tariff provisions, because when defendant delivered these ten cars it recognized that the tariff provisions had been substantially complied with. There was no need for any further information or data as required by the tariff. And obviously, when defendant pulled out these eight cars, and by reason of its conduct thereafter, it would have been, and was, futile to order any more cars. Defendant had unequivocally determined and announced to plaintiff that, as of March 30th, it would not provide any more cars for plaintiff until the strike ended. Surely, in view of these circumstances, plaintiff was not required to do a vain, futile and useless act. During all of these times, defendant fully understood and was informed that plaintiff

desired enough cars to remove all of the perishables and groceries from these two warehouses. At no time did defendant question the sufficiency of these requests, nor did it base its refusal to furnish switching service upon any alleged failure of plaintiff to comply strictly with the terms of defendant's tariff. When the application for a temporary mandatory injunction was made and heard by this Court, defendant at no time based its refusal to furnish cars on any other ground except that its trainmen refused to switch cars on to the track adjacent to plaintiff's plant.

■■ Defendant contends that plaintiff failed to exercise reasonable care to minimize its damages after learning that it could not obtain car service from defendant, and this defense is based primarily upon the assertion that plaintiff should have availed itself of other means of transportation, such as over-the-road vans or other vehicles to transport the merchandise from the Minneapolis warehouse to plaintiff's various branches where the goods could have been sold and loss prevented. However, in that regard the evidence is clear that plaintiff did endeavor to get trucking companies to haul this merchandise, but due to the strike the drivers of the trucking companies being members of the same Union as the strikers in plaintiff's plant, refused to cross the picket line. Whether the other common carriers were justified in refusing service to plaintiff will not absolve defendant from its failure to perform its statutory duty. The only question that the Court needs to determine is whether plaintiff exercised reasonable care in endeavoring to minimize its damage, and the evidence fully sustains a finding to that effect. And the same observation may be made with reference to defendant's contention that certain team tracks or loading facilities were available on other railroads entering Minneapolis and that plaintiff's merchandise could have been hauled there and put on cars of other carriers. But, obviously, the same obstacles existed with reference to such transportation as existed with reference to the obtaining of over-the-road vans or other motor vehicles in transporting plaintiff's merchandise out of the city. The strike paralyzed the movement of any trucks or motor vehicles into plaintiff's plant.

■ Some reference is made by defendant to the provision in the Labor Management Relations Act of 1947 as supporting its position that its employees were justified in not manning the cars which were to be moved out of plaintiff's premises. The pertinent statute to be relied upon is to be found in 29 U.S.C.A. § 158. This refers to the so-called secondary boycott as being an unfair labor practice of a labor organization, and after certain recitals relating thereto the Act contains subdivision (b)(4), which reads in part,

> "Provided, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter".

Clearly, this section has no application to the question as to whether a railroad common carrier must provide railroad services to an industry whose employees are on strike. We are not concerned in this proceeding with so-called unfair labor practices. In addition, it may be pointed out that the railroad employees are under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and not under the Labor Management Act. Moreover, there is another complete answer to defendant's contention, and that is, the premises on which plaintiff's warehouse is located, while leased from defendant, the Railway Company retains ownership of the tracks and the right to pass over them for switching purposes not only for the serving of Gamble Robinson, but for the service of any other patron and shipper. The operation of locomotives and cars over these tracks would not require defendant's employees to enter upon plaintiff's premises. At all times in the placing of cars on the loading tracks, the railway employees would be on tracks owned and controlled by their own employer.

That defendant's failure to comply with its common law and statutory duty in furnishing cars to plaintiff resulted in substantial damage to the perishables and other merchandise in these warehouses is undisputed in the evidence. When car service was made available to plaintiff on or about June 19th, at which time the strike ended, substantial damage had resulted to the perishables, such as fruits and vegetables, as well as to the groceries. There is no particular problem with reference to the appropriate rule of damages as to the perishables, such as fruits and vegetables, in that the parties have agreed that if plaintiff is entitled to recover, the appropriate measure of damages to such merchandise would be the difference between the fair and reasonable market value of such commodities as were on hand as of March 30, 1949, and the fair and reasonable market value of such commodities as of June 19, 1949. Plaintiff's evidence is uncontradicted that, applying this rule, the total damages to the perishables amounts to $18,580.41, and as the market values of both March 30th and June 19th include the delivery cost to the purchasing customer, that element of expense is not to be deducted in any determination of the net damage to plaintiff. True, defendant does question the right to recover damages for more than the amount of merchandise that ten cars would be able to move; that is, it contends that it never received an order for more than ten cars and the evidence indicates that the merchandise would have required twenty cars in order to remove all of the stock. But the loading track would only hold ten cars and it would have been futile for plaintiff to order twenty cars at one time when defendant refused and neglected to furnish the first ten. Obviously, if defendant had furnished the first ten cars which were ordered, there can be no doubt that additional cars would have been ordered so that the entire contents of the two warehouses would have been moved. It seems, therefore, that this defense is captious and without any real substance.

The next item of damages pertains to the alleged damage to the groceries contained in plaintiff's plant. The evidence offered by plaintiff indicates that the losses to the groceries are not based upon the difference in market value, but upon certain losses alleged to have proximately resulted from defendant's refusal to furnish cars, and these losses may be summarized as follows,

1. The losses which were total by reason of deterioration in the groceries between March 30th and June 19th.

2. The losses to the groceries which occurred by reason of partial deterioration thereof during that period;

3. The losses to the groceries by reason of market decline from March 13th to June 19th.

Plaintiff's evidence indicates that wholly unsalable items by reason of complete deterioration amounted to $1,219.14, and partial deterioration resulted in damage amounting to $776.39. The evidence also indicates that the damage by reason of market declines amounted to $3,635.63. These three categories of damage total $5,-631.16. The evidence as to deterioration and the resulting losses caused by the delay in the movement of these items to the market is without any substantial dispute. Moreover, it is uncontradicted that, by reason of the failure to obtain cars and to move this merchandise to the market, there was a substantial drop in the market between March 30th and June 19th, and in disposing of this merchandise after June 19th the loss of $3,635.63 was sustained. It seems to follow, therefore, that the complete deterioration, the partial deterioration, and the market decline represent the actual money loss which plaintiff sustained. If damages are allowed on this basis, plaintiff will not be recovering anything more than its actual money loss. This theory of damage by way of market drop finds support in a decision of the Minnesota Supreme Court in Richey & Gilbert Co. v. Northern Pacific R. Co., 110 Minn. 347, 351, 125 N.W. 897, wherein the court approved the trial court's charge which stated, in part,

"If a railway company by its fault delays a shipment, thereby causing a shipper to lose a favorable market as

to price and so compels him to market or dispose of his apples after the price has declined, the railway company is chargeable with the resulting loss."

█ The next item of damage claimed by plaintiff may be designated as refrigeration expense. This is based upon the theory that plaintiff was required to keep its refrigeration equipment in operation during the period between March 30th and June 19th, and it is asserted that, if it had been afforded car service and the warehouse emptied of everything requiring refrigeration, the operation of the refrigeration machinery could have been dispensed with. And plaintiff has assumed to allocate the item of expense in the operation of its refrigeration plant on a per-day basis. However, in listing its expense it includes depreciation, interest, taxes and insurance, and obviously some of these items, at least, would have occurred even though the machinery was not in operation. This amount of claimed damage totals some $2,567.81, and includes the salary of the engineer or maintenance man of the refrigerator system. Obviously, this plant intended to reopen just as soon as the strike was settled and the assertion that this maintenance man would have been released from the payroll if car service had been afforded is not reasonable or probable under all the circumstances. The Court is of the opinion, after due reflection, that this item of damage should not be sustained.

█ The next item of damage is that which is designated as "stand-by loading crew" expense. This pertains to plaintiff's employees who were retained on the payroll and assumedly held in readiness to load these cars had they been furnished by defendant. The salary paid to these men totals some $9,313.06, and plaintiff assumes to charge defendant with this expense because it asserts that it was expecting that defendant would comply with its statutory duty during this period and held its men in readiness to load the cars when and if they were made available. But it seems obvious that this item of expense cannot be allowed regardless of whether or not it was reasonable to maintain a so-called stand-by loading crew in

anticipation that defendant would furnish cars. It seems evident that these men were on the payroll of the plaintiff company and would have been retained on the payroll regardless of whether the defendant furnished car service. The employees of Gamble Robinson were on strike. No doubt overtures were being made for settlement of the strike during this entire period. In all probability, plaintiff had to retain these men on the salary roll so as to be in readiness for resumption of business as soon as the strike was ended. The theory that they were maintained solely as a stand-by crew in order to load cars if and when they were made available seems wholly void of any real substance.

█ The same observation may be made with reference to the item of watchmen service totaling some $1,169.55. The testimony is to the effect that watchmen were required to be on hand on a twenty-four hour basis by reason of valuable merchandise being in the warehouse, and it is contended that if the warehouses were emptied the services of the watchmen would have been dispensed with. Again, the fact that the strike was continuing undoubtedly made it necessary for plaintiff to maintain watchmen regardless of whether the warehouses were empty or full. The evidence and alleged reasons in substantiation of this item of damage are not persuasive. This item will be disallowed.

█ The claim for attorneys' fees is based upon Section 8, 49 U.S.C.A., which sets forth the damages to be allowed in the event the carrier violates the Act, together with "a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case." This Court is limited to a consideration of the legal services rendered in connection with the damage claim, and the services rendered with reference to the application for injunction and the proceedings connected therewith, including the appeal, cannot be considered. The amended complaint filed in pursuance of this Court's order, which pertained exclusively to the issue of damages, was served on December 9, 1950. Damages in the sum of $190,-

118.64 were requested, with attorneys' fees in the sum of $35,000. At the time of the trial, the *ad dammum* clause was amended and damages in the sum of $340,906.60 were requested. At the trial, many items of damages were abandoned for lack of sufficient proof, and plaintiff now recognizes that its total damages on the evidence submitted cannot exceed $37,261.99. The amount of damages allowed total $24,211.-57. Plaintiff now requests allowance of attorneys' fees in the sum of $16,155. It contends that that amount represents the fair and reasonable value of the services of plaintiff's attorneys pertaining exclusively to the issues of the damage suit, although some of the items of service antedate the institution of the action for damages. No doubt many factors should be considered in determining the amount to be allowed by way of attorneys' fees, including the nature, novelty, and complexity of the issues, the time involved, the results obtained, the quality of the legal services rendered, the skill and professional standing of counsel—and no doubt other considerations. Under this statute, attorneys' fees in view of all the circumstances should be reasonable, and due consideration should be given to the apparent purpose of allowing attorneys' fees, which is to induce carriers to pay just claims promptly. The carrier here was confronted with a demand entirely out of proportion to the actual damage sustained. Moreover, when the car services were requested, it must be recognized that the situation presented to the carrier was an uncommon one and not the usual and normal problem which confronts a carrier when demand is made by a shipper for car service. All of these factors are matters to which due consideration should be given when the amount of attorneys' fees to be assessed as costs is to be determined. After due consideration, the Court is of the opinion that attorneys' fees of $5,000 should be fair and reasonable and equitable to both parties and that this amount should be allowed by way of costs to be taxed herein.

Findings of fact and conclusions of law consistent herewith may be presented upon five days' notice. An exception is allowed.