**MINNEAPOLIS & ST. LOUIS RY. CO.**

**v.**

**PACIFIC GAMBLE ROBINSON CO.**

No. 14768.

United States Court of Appeals, Eighth Circuit.

Aug. 20, 1954.

**128**

Richard Musenbrock, Minneapolis, Minn. (C. W. Wright, William J. Powell and George M. Stephenson, San Pedro, Cal., on the brief), for appellant.

Perry R. Moore, Minneapolis, Minn. (Floyd E. Nelson and Mackall, Crounse, Moore, Helmey & Palmer, Minneapolis, Minn., on the brief), for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

**JOHNSEN, Circuit Judge.**

A shipper sought damages against a railroad for failing, upon request, to switch in cars to its plant, to enable it to load and move out its perishable fruits and vegetables and other stock from its warehouse, while the plant was under strike and picketing by its truck drivers, helpers and loaders. The court, on a jury-waived trial, granted the shipper a recovery, 105 F.Supp. 794, for the loss which it had sustained in spoilage, deterioration and price-decline, from its inability thus to get its goods moved out of its plant for disposition.[1] The railroad has appealed.

The shipper was Pacific Gamble Robinson Co.,[2] a distributor at wholesale of fruits, vegetables and grocery items, with plants or warehouses located in various cities throughout western and midwestern United States, including Minneapolis, Minnesota, which is the one that is here involved.[3] The railroad was the Minneapolis & St. Louis Railway Company,[4] an interstate carrier, which owned the switch and spur tracks running to the Minneapolis plant.

The Railway Co. claimed that it had not been reasonably possible for it, because of the strike situation, to switch in cars to the Gamble-Robinson plant during the period that it was charged with having failed to perform its statutory duty.[5] The members of its regular switching

---

1. The complaint for damages was allowed to be filed in a mandatory injunction suit, which the shipper had brought during the strike to compel the railroad to switch in cars to its warehouse, and in which the court had issued a temporary mandatory writ, 83 F.Supp. 860. An appeal had been taken by the railroad from this order, but before the appeal was reached for hearing the strike had been settled, and the appeal was accordingly dismissed as moot, Minneapolis & St. L. Ry. Co. v. Pacific Gamble Robinson Co., 8 Cir., 181 F.2d 812. The trial court thereafter entered a dismissal of the mandatory injunction suit, D.C., 92 F.Supp. 352, but later amended its order to allow the filing of a supplemental complaint to present the question of damages. See D.C., 105 F.Supp. 794, 798.

2. Hereinafter called Gamble-Robinson.

3. The strike was against the Minneapolis plant or warehouse only.

4. Hereinafter called the Railway Co.

5. "It shall be the duty of every common carrier subject to this chapter engaged in the transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor, * * *." 49 U.S.C.A. § 1(4). Transportation, for purposes of the statute, includes the incident of providing car service, with such movement, distribution, etc., thereof as are within the regular scope of the carrier's operations. Id. § 1(3), (10) and (11).

The statute further provides that "In case any common carrier subject to the

crews testified that they would not switch in cars to the plant, because they were afraid that they and their families would be subjected to bodily harm from the strikers or their adherents, if this was done. The general chairmen of the several railroad unions, to which the various members of the switching crews belonged, testified that they would not order the men to carry out the task, as part of the employees' contract obligation to the carrier, because of the danger to the safety of the men, which they believed existed.

Such supervisory personnel as the Railway Co. might otherwise have had undertake the operation, upon refusal of the switching crews to do the work as a contract task, testified that they too were unwilling to switch in the cars, because they had the same fear of bodily harm to themselves and their families, as did the members of the switching crews. The executive officers of the Railway Co. testified that they also were convinced that the fears of the switching crews and the supervisory personnel were real and warranted, and that they therefore could not in good employer-conscience, after making request and having that request refused, demand of their employees that they perform the task or be disciplined for their refusal.

The Railway Co. further showed that, although it felt that it had no right to issue an ultimatum to its switching crews and supervisory personnel, after their refusal, because of the safety-risk which it regarded as existing, it nevertheless had undertaken to call for volunteers among its employees to do the work, by posting notices or requests on its numerous bulletin boards and elsewhere, to which, however, it did not receive even a single response.[6]

Various circumstances were detailed by the witnesses as an alleged basis for the fears which they expressed. Two members of the switching crews testified to the fact of the striking union having a previous record and reputation of violence and reprisal. They said that, while the union now bore a different local-charter number, it was "the same outfit" that had engaged in violence, police-battle and bloodshed, during the last strike covering this same plant and others, approximately 15 years before,[7] some of the incidents of which they had personally witnessed. One had seen a man killed by the strikers or their adherents. He testified also that he knew of persons, who had "mixed" in the strike referred to, that "were hunted down two or three months after the strike was over and beaten up." Another, a present switching-crew foreman, had seen the police routed out of the strike area with clubs during that controversy and had himself led to safety one of the officers, whose scalp had been laid open from blows, and who had blood "running down his face."

The witness, without objection, volunteered this summary of his reactions and

provisions of this chapter shall * * * omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case." 49 U.S.C.A. § 8.

6. It might perhaps be a bit naïve to expect that, in any strike situation where the employer gave them a free choice, the members of one union would volunteer to gratuitously do anything detrimental to the cause of another union, against which organization they had no hostility, in a dispute in which they had no affecting interest, and on a matter that might have a direct relationship to the length or outcome of the strike—such as the removing or confining of the perishable stock here could and did have, in that, after Gamble-Robinson was unable to get its stock out of its warehouse, the union increased its previous demands, and apparently also Gamble-Robinson thereupon became willing to reopen the negotiations, which had ceased some time after the strike began.

7. The union was at that time (1934) allegedly Communist dominated.

position: "It was worse than World War I or II. That is why I do not want to cross the picket line." The other switching-crew witness similarly, without objection, summarized his reactions with the statement, "Well, I seen enough bloodshed that one day to last me the rest of my life," and made the declaration that he would not switch in cars in the present situation, except with the consent of the striking union, "on account of my own personal safety and the safety of my family." [8]

The reasonableness of these expressed fears and reactions in the situation was attempted to be more proximately demonstrated by two incidents which had occurred in the current strike, which the two witnesses and other employees of the Railway Co. had observed, and with which all of the switching crews, supervisory personnel and executive officers involved were familiar. The first of these had taken place on March 11, 1949, the day after the strike began. Some of the non-striking employees of Gamble-Robinson had undertaken to load a car, that was standing on the spur track at the time, with crates of vegetables from the warehouse, when a group of approximately 200 men suddenly appeared, seized some of the crates and scattered the vegetables onto the ground—sufficiently so that the loading operation was discontinued. The switching crew was on duty in the neighborhood at the time and had observed the happening.

The second incident occurred on March 29th. Following the car-loading interference engaged in by the union on March 11th, Gamble-Robinson had procured a state-court restraining order, which remained in effect throughout the strike, and the union, from that time on, up to March 29th at least, had apparently instructed its members not to interfere with any switching operations of the Railway Co., and this fact had either officially or unofficially been made known to the Railway Co. and its employees. A few empty cars, as they were requested by Gamble-Robinson, had accordingly been switched in at intervals to the plant, and 2 or 3 of these had been loaded and moved out, without interference. Gamble-Robinson had shortly thereafter, however, directed that such empty cars as were then standing at the plant be moved out to avoid further demurrage, and this also had been done. Later, on March 28th, Gamble-Robinson had once more requested that a number of empty cars be switched in, 5 on each of the two spur tracks at the plant, which the Railway Co. did. The following day Gamble-Robinson asked the Railway Co. to haul out 2 of the cars, which it had by that time loaded with goods, for shipment to some of its warehouses in other cities.

The switching crew was sent down to perform the operation during the afternoon of that day. When the engine came to the crossing immediately proximate to the warehouse, it stopped, and the foreman of the crew got off and onto the ground, in accordance with the custom and practice regularly used by the railroad in making movements onto the tracks of the plant. At this juncture, someone came up to the foreman and asked him where the engine and crew were going. The foreman replied that they had been sent to take out two loaded cars from the plant, and at the same time he made inquiry whether the union's previous order as to the non-interfering with such removals still "held." His interrogator told him to wait a moment and he would find out. He returned in a few minutes with another man, who said to the foreman, "Don't move a car. That order is no good."

Twenty to twenty-five men were at the time standing nearby, but no threat or other display of any kind was made. The switching-crew foreman immediately called his superior on the telephone,

8. One of the executive officers of the Railway Co. testified generally that during the preceding 15 years, in connection with strikes of the union involved, "four murders have occurred; in addition thirty police officers were hospitalized; and something in excess of sixty others became casualties."

to advise the latter of the development, and was directed not to do anything more until he received further instructions. The time for the switching crew to go off duty arrived before any such instructions were received, and they accordingly removed the engine and themselves from the scene without doing anything more.

That evening, the Assistant General Superintendent of the Railway Co. requested the general chairman for the switchmen's union on the railroad to see if he could get the consent of the officials of the striking union to allow the switching crew to pull out the two loaded cars. These officials replied that they would consent to the two loaded cars being moved out, provided that the Railway Co. at the same time also removed the 8 remaining empty cars from the plant. The Railway Co. promptly acceded to this condition and instructed its switching crew to so proceed, without in any way informing Gamble-Robinson of the union's imposed condition and its accedence thereto.

According to one of the members of the crew, when the switch engine appeared upon the scene the following morning, there was some murmuring on the part of a few of the men standing around, until they were advised of just what was going to be done and of the union officials' agreement thereto.

Gamble-Robinson, after discovering what had been done, immediately protested to the Railway Co. and made demand for a return of the 8 cars or an equal number of similar empties, to be spotted the same as those removed had been. Approximately a week later, it made a renewal of the request. The Railway Co. never formally answered either of these demands or requests. After waiting another week, Gamble-Robinson made application to the federal court for a writ of mandatory injunction, to compel the Railway Co. to fulfill its common carrier duty and furnish it with the requested service. The District Court, upon a hearing, granted a temporary mandatory writ against the Railway Co., on April 27, 1949, which order remained in effect until after settlement of the strike on June 18th.[9]

On May 9th, the Railway Co. tried to get the court to stay the further force and effect of the temporary writ granted, but the court, after holding another extensive hearing, refused to do so. Meanwhile, on April 30th, Gamble-Robinson had renewed its request for immediate delivery of the 8 cars which had been previously removed, subsequently re-demanded, and never re-provided, and also made request for 2 additional cars, or a total of 10 cars of specified kind. The Railway Co. iced the refrigerator cars which had been requested and held them in readiness for movement to the plant but claimed that it was not able to get them switched in, because of the refusal of its employees to carry out the operation, as previously discussed.

The testimony which has been set out would, we think, by general face acceptance of it, have entitled a trier of the facts to evaluate the situation, as being one in which the Railway Co. and its employees had in good faith believed that an actual danger to the safety of the employees existed, if the switching operations were carried out; that the failure of the Railway Co. and its employees to switch in the cars had rested on the believed existence of this condition in the shipper's situation; and that the believed danger was one of sufficient probability and such substance, on the basis of reasonable labor and industrial ap-

9. As indicated in footnote 1, supra, the Railway Co. took an appeal from the order granting the temporary writ, but the appeal was not reached for hearing until after the strike was settled, when it was dismissed as being moot, because it was admitted that the termination of the strike had ended the problem of obtaining whatever service from the Railway Co. that Gamble-Robinson might desire. See Minneapolis & St. L. Ry. Co. v. Pacific Gamble Robinson Co., supra, 8 Cir., 181 F.2d 812.

praisal, as legally to warrant its recognition as an existing fact in the shipper's situation, as related to the reasonableness of his service request.

Such an acceptance and evaluation on the part of a trier of the facts would, of course, have required that Gamble-Robinson's request for shipper service, in the circumstances of its strike situation, legally be held to have been an unreasonable one, within the prescription and measure of a carrier's obligation under the statute, 49 U.S.C.A. § 1(4), supra, "to provide and furnish * * * transportation upon reasonable request therefor". It would hardly be a reasonable request for carrier service, for a shipper to demand in effect, by virtue of that result necessarily being inherent in any attempted compliance, that a railroad require its employees to spill their blood in his existing strike situation, or that it compel them to subject themselves and their families to a real and substantial danger of retaliatory bodily harm in their outside life from his striking employees.

■■ That much, public policy, social dignity, and congressional concern for the safety and welfare of carrier employees as reflected in the spirit of modern railway-labor and other legislation, would seem inescapably to command. It cannot be said to have been any part of the purpose of 49 U.S.C.A. § 1(4) to try to assist shippers in breaking their strikes.[10] On the other hand, neither is the statute capable of being read as having any intention to relieve carriers and their employees of all obligation and responsibility to provide service to a shipper merely and abstractly because his plant is under strike.

■■ The existence of a strike against a shipper—at least where, as here, there is involved no contractual tie, or other specific community of labor interest, between the unions of the carrier's employees and the shipper's employees, by which the actions of the carrier's employees are controlled—is, in its carrier aspect, simply a condition in the shipper's situation, which, like any other special obstacle or difficulty of abnormal shipper-situation,[11] the carrier has the right to responsibly evaluate, on all its elements, as a question of whether the situation thus fairly constitutes the shipper's demand for service from the carrier as one of "reasonable request" under the statute.

As we have said above, a trier of the facts might properly, we think, from the surface of the testimony which has been set out, have become convinced, and have found, that the situation here was one in which there existed in fact such substantial danger, or reasonable probability thereof, to the personal safety of the carrier's employees as would responsibly warrant any switching crew and any supervisory personnel of a railroad in refusing to carry out the task, and also responsibly warrant any railroad in recognizing and accepting this refusal as

10. Here, as indicated in footnote 6, supra, and as the trial court recognized, it was, of course, an important factor strategically, in the respective positions of Gamble-Robinson and the union, whether the perishable stock was gotten out of the warehouse or was not gotten out. The carrier could not be called upon by Gamble-Robinson to do any act, or by the union to refrain from doing such act, on the basis of trying to make it take sides in the dispute. But if a request for service was made upon it in a strike situation, where it was reasonably possible, as a matter of general carrier operation and with legal neutrality, to provide the service, it also was no part of the carrier's business to look at what practical result the performing of its statutory duty might have in relation to the strike situation between the parties.

11. Thus, a physically dangerous condition of a spur track, owned and maintained by a shipper, over which, from lack of repair, a switch engine or a freight car could not safely be moved, would comparably, as the strike situation here, present a question for carrier evaluation of whether the shipper's demand for service was in the circumstances of his situation a "reasonable request" under the statute.

justifiable employee conduct, without the need, therefore, in such a situation, for any attempted urging or disciplinary action, as part of the effort which might perhaps otherwise be owed in its public obligation of furnishing carrier service; [12] that the fact of the existence of such a substantial danger or the reasonable probability thereof in the present situation had been the actual basis of the employees' refusal to perform the switching operations, and their refusal had been one of absoluteness and good faith; and that in the circumstances it thus could not be said to be, nor was it, reasonably possible for the carrier to have furnished the requested service. This evaluation of the situation would, as we have indicated, legally have made Gamble-Robinson's demand for service an unreasonable request under the statute and so have left the Railway Co. without any liability for having failed to furnish the cars.

But the trial court here did not feel satisfied, as a matter of judicial responsibility, to thus baldly accept these surface indications—which a jury might possibly have done—as representing the actual realities of the situation, without engaging in some penetrative probing of the history and the incidents which had been involved. So proceeding, the court became convinced, and found, that the Railway Co. had, from the very start, before any problem of evaluating danger had arisen, determined as a matter of policy to avoid any possibility of friction with the striking union, by undertaking to furnish Gamble-Robinson only with such service as the union was willing to approve; [13] that the employees knew of this attitude on the part of their employer and so understood among themselves that they were not obliged to perform any switching services to which the striking union had not consented, but were free to refuse, with impunity and employer acceptance, any such requests which the carrier might purport to make of them; and that this policy of the carrier in the situation and the understanding of the employees thereof had been, throughout the whole strike, the real basis and measure of the efforts made and intended to be made to furnish Gamble-Robinson with shipper service.

On careful consideration, we are of the opinion that there exists a sufficient probative basis on the circumstances and incidents in the record to support the court's inferences as to these having been the existing facts, so that we are not entitled to overthrow them as unwarranted findings in the particular situation. The attempt to justify the failure to furnish the service on the ground of danger to the personal safety of the carrier's employees thus was entitled to be regarded by the court as one, not of actuated conduct, but of legal defense only, unenveloped by that margin of softening allowance which will ordinarily attach itself to any trial appraisal of adopted human course, where a party finds himself in the position of being required to make immediate evaluation of a probable risk, and where he has taken action in relation thereto on the basis of good-faith exercised judgment.

On this basis, we do not think that the trial court can be said to have unwarrantedly viewed the fact that the striking union had used violence against policemen and strike-breakers, in a strike occurring in 1934, as not being substan-

12. Here, as has previously been indicated, the carrier claimed to have thus evaluated the situation and to have refrained from any attempted urging or disciplining action on this basis. The trial court found, however, as is later discussed, that this was not in fact the case, in that the carrier's conduct had been controlled by other motive and had rested on other basis.

13. The carrier's attitude was one of not only being willing to refrain from furnishing cars which the union did not approve, but also being willing apparently to move out, as it did on March 30th, referred to above, cars which it had previously furnished, after the union so desired.

tially impressive of any reasonable danger of violence to the employees of a carrier, in 1949, engaged simply in switching in or moving out railroad cars, so as legally to excuse the carrier and its employees from making any attempt at all to perform these operations on that ground.

In this connection, it is entitled to be borne in mind that labor has come a long way, since 1934, in strength, stature and responsibility, and in legislative implements provided for carrying on its struggles, so that the strikes of that earlier period, in all their sordid incidents, cannot be said generally to be typical of the strikes of today. Furthermore, in the present situation, as the court noted, there had been in effect, all during the time that the carrier failed to furnish service, a state-court restraining order, obtained by Gamble-Robinson, which among its prohibitions, directly forbade the union and the strikers from interfering in any way with the trackage at the plant and transportation thereover, and which the union was not shown to have in any way ever violated or made threats to violate.

Again, as to the incident of March 11th, in which crates of vegetables were scattered at the plant, the court, in appraising the realities of the carrier's non-motivating defense, similarly was entitled to note that this had occurred only in relation to the loading of a car by Gamble-Robinson's own non-striking employees and not to any moving of empty or loaded cars by the carrier, and, moreover, it also had happened prior and not subsequent to the issuance of the state-court restraining order.

And, as to the incident of March 29th, when the strikers told the switching crew that the union's previous consent to the moving of cars was no longer in effect and that the crew should not engage in moving any cars, the court likewise had the right to consider that this had not been accompanied by any expression of threats or manifestation of intended violence or reprisal against the carrier's

employees, but only, so far as the record showed, by regular and orderly tones of conversation on the part of those who purported to be the leaders in the matter, and without any indication that the state-court restraining order was from then on going to be accorded no further recognition.

We must accordingly hold that there was a sufficient basis for the court to appraise the whole situation as it did, and that on this appraisal it could properly conclude that the carrier had not sufficiently measured up, in its efforts, to the obligation resting upon it to undertake, in good faith and with proper carrier responsibility, to provide shipper service, not as a matter merely of individual shipper right but as a question also of general public duty.

While the law, of course, exacts only what is reasonable from a carrier, Midland Valley R. Co. v. Barkley, 276 U.S. 482, 485, 48 S.Ct. 342, 72 L.Ed. 664, it does, in the general public interest, require of every carrier "the utmost fairness and good faith on its part in dealing with the shipper and in the discharge of its duties to him," Chicago & E. I. R. Co. v. Collins Produce Co., 249 U.S. 186, 193, 39 S.Ct. 189, 190, 63 L.Ed. 552.

The circumstances and incidents, as we have indicated, made the present situation one in which there existed an adequate probative margin or basis for a determination on the part of the trier of the facts of actuating motive and for an admeasurement by it of responsible effort in relation to that motive. The court necessarily recognized the right of the carrier to try to avoid friction with the striking union but properly said that the carrier could not responsibly make the bald grace or whim of the union the measure of its duty or its attempt to furnish service.

In addition to the initial managerial intent to avoid any friction whatsoever with the striking union, which the court found had existed, the court felt that the carrier's allowance of the wishes of the

union to become the sole criterion of its carrier performance was further indicated by its hauling out of the 8 empty cars on March 29th, pursuant to the union's request and without advising Gamble-Robinson of what was being done, and by the facts that, even after the federal court had issued a temporary mandatory writ and had refused on subsequent application to stay the force and effect of the writ, the carrier made no effort to impress upon its employees the responsibility which rested upon it and them to try to comply with the writ until the validity thereof was capable of being tested out on appeal; to emphasize to them that the striking union was under judicial mandate from the state court not to interfere with the trackage to the plant or the transportational use thereof; to demand of the officials of the striking union, if they rejected such requests for consent as the carrier saw fit to submit to them, not to interfere with its performance of the public function which the federal court, by mandatory writ, had ordered it to carry on; or to attempt to invoke in any manner, by call upon state authorities or the federal court, if it believed this necessary to prevent interference, the protective powers of the law, implicit in both the state and federal injunctions.

As the court summarized it in its reported opinion: "The undeniable fact is that the railroad company took no affirmative steps whatsoever to comply with its duty as a common carrier, and did nothing to insist and demand that the strikers should not interfere with the performance of that duty. It is not necessary here to determine the extent that a carrier must go in order to relieve itself of dereliction in fulfilling its statutory duty when confronted with strike conditions in an industry which it serves. Suffice it to say that the showing here reflects an absence of any bona fide attempt to comply with the carrier's duty. * * * The duty which rests upon a common carrier cannot be so lightly thrust aside." And so, on the whole situation, the court concluded that the showing of mere "lip service to the duty which the statute imposed," that the carrier had made, did not require the court to "sustain defendant's contention that it was excused from complying with its duty to furnish railroad cars to the plaintiff during the period in question." 105 F.Supp. at page 802.

It should hardly be necessary to add that it does not, of course, matter here that appellant is able to argue that some other trier of the facts would probably have evaluated differently the motive and conduct of the carrier and its employees and have concluded that Gamble-Robinson's demand for services was not, in the circumstances of its particular strike situation, a "reasonable request," [14] such as any carrier fairly could be expected to fulfill, or such as, in any event, another carrier would normally, and to believed purposive-end, have made more effort to fulfill, than did the Railway Co. here. That possible incongruity of results is inherent in every legal situation of unabsolute facts, and it is of no more significance in this than in any other kind of a case of alleged-and-denied legal wrong done.

So far as our review function is concerned, it is controlling that the record affords an adequate basis for the appraisal which the trial court made of the situation, and that, on the facts which the court found, we cannot properly declare as a matter of law that the Railway Co. was without any breach of carrier faith

14. It has only been necessary to deal with the situation here on the basis of the direct language of the statute, as a matter of whether the shipper's demand constituted a "reasonable request" for service by him, since the elements by which the carrier's failure to furnish the service were claimed to be controlled rested in the shipper's own situation. In some situations, of course, the question of whether a carrier is reasonably excused from furnishing service may rest on elements outside the shipper's situation, such as circumstances in the carrier's situation, or even circumstances wholly outside both the shipper's and the carrier's personal situations.

and effort in its public duty, as a basis for imposing liability upon it.

The trial court, however, gave damages against the carrier, not only for its failure to furnish the 10 cars which Gamble-Robinson had expressly ordered but also for its failure to furnish 10 additional cars, never actually ordered, which was the number that would have been needed to effect a removal of all the stock from the warehouse. The court imposed liability as to these unordered cars, on the ground that the carrier knew that it was Gamble-Robinson's desire and intention to completely empty its warehouse; that, in view of the carrier's adopted position and attitude, it was indisputable that "it would have been, and was, futile to order any more cars"; and that "plaintiff was not required to do a vain, futile and useless act." 105 F.Supp. at page 803.

■ But the "useless-act" principle of general contract situations is without application to the field of carrier tariffs. Tariffs are the basis on which both a carrier's obligation to furnish service and a shipper's right to obtain it legally rest. Neither carrier's obligation nor shipper's right can be contended to exist in relation to any service which a shipper has sought to obtain without substantially complying with the requirements of a governing tariff, and which the carrier has not recognizedly undertaken to provide in the particular situation. See Christensen v. Northern Pacific Ry. Co., 8 Cir., 184 F.2d 534, and cases cited therein. This policy of the law, of requiring adherence by both carrier and shippers to the conditions of a tariff, has for its purpose the safeguarding of shippers in general against special favors in service to any and the assuring of equal treatment in service for all. Cf. Davis v. Cornwell, 264 U.S. 560, 562, 44 S.Ct. 410, 411, 68 L.Ed. 848.

■ Here the tariff prescribed that orders must be given for any cars desired. However futile for practical purposes in the present situation, it might perhaps seem to have given such orders,

they were essential for legal purposes, as a basis of giving rise to carrier obligation and shipper right. The court was accordingly not entitled to impose any liability upon the carrier, for having failed to furnish the 10 cars which the shipper had never at any time actually ordered.

The Railway Co. has argued that it ought equally to be held to be without liability for any damages which may have resulted from its failure to have furnished the 10 cars actually ordered, prior to April 30, 1949, because, until Gamble-Robinson's letter of that date, such requests or orders as had been given to it for any of these cars had not contained the details of information required by the tariff in relation to the requested service.

■ As to 2 of these 10 ordered cars, it seems clear from the record that there had never been any request or order at all, until the letter of April 30th, so that necessarily, as to these, the carrier could be held liable only for failing to furnish them after that date, and not for any damage which may previously have occurred to Gamble-Robinson's stock.

As to the other 8 cars, however, the carrier is entitled to be held liable from March 30th, the date when it improperly removed them from Gamble-Robinson's plant and failed to have them returned. The Railway Co. had recognized the order or orders given for these cars as being in sufficient compliance with the provisions of its tariff to entitle Gamble-Robinson to receive the cars and had on this basis assumed to provide the service. The question of the sufficiency of the orders given for these cars is therefore entitled to be treated here as a collateral matter, of which the Railway Co. is not entitled to ask us to make examination. And what the Railway Co. had thus initially recognized and accepted as being in compliance with its tariff obviously is just as much entitled to be treated as a closed collateral matter for purposes of the practical demand made by Gamble-

Robinson to have these improperly removed cars returned.

Other contentions for reversal have been made by the Railway Co., all of which we have examined and regard as being without substantial merit.

The contention that the question of duty and liability involved were matters for administrative and not judicial cognizance, so that jurisdiction should be held to rest solely in the Interstate Commerce Commission, does not require any answer beyond what has been said by the trial court in its opinion, 105 F.Supp. at pages 798 and 799.

[redacted] Nor is it necessary to discuss at any length the contention that the Railway Co. was without liability for failing to attempt to furnish the requested service, because of the proviso of § 8(b) (4) of the Labor Management Relations Act, 29 U.S.C.A. § 158(b) (4), that "nothing in this subsection [defining unfair labor practices of a labor organization] shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter."

All that this language says is that none of the definitions and prescriptions of unfair labor practices made applicable to a labor organization by subsection (b) of § 8 of the Labor Management Relations Act is entitled to be taken to mean that the statute has in any way attempted to make it unlawful for any person to refuse to enter upon any struck premises of the category described in the proviso. Or, as stated in Report 105 of the Senate Committee on Labor and Public Welfare, 80th Congress, pp. 22–23, "In other words, refusing to cross a picket line or otherwise refusing to engage in strikebreaking activities would not be deemed an unfair practice unless the strike is a wildcat strike by a minority."

Whether this proviso, in its direct or contextual relationship to unfair labor practices under the Labor Management Relations Act, can be contended to have any application whatsoever to carrier employees can perhaps be doubted. But, however that may be, it is at least certain that the language of the proviso does not declare or imply that, because the refusal of employees to cross picket lines against other employers does not of itself make them guilty of unlawful secondary boycotting, a carrier is left without any duty to make any effort whatsoever to furnish service in such a situation.

[redacted] As to the complaint made concerning the allowance of interest, that matter was one for the discretion of the trial court, and it cannot be said that such discretion was here abused. See Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 61 S.Ct. 995, 85 L.Ed. 1361; Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 84 L.Ed. 313; Funkhouser v. J. B. Preston Co., 290 U.S. 163, 168–169, 54 S.Ct. 134, 78 L.Ed. 243.

[redacted] Also, the breach of carrier statutory duty which we have recognized above, as having been entitled to be found by the trial court to exist, would, of course, leave appellant subject to the assessment of an attorney's fee by the trial court, under 49 U.S.C.A. § 8.[15]

None of appellant's other contentions merit mention or discussion.

On the basis of what has been said in this opinion, the judgment of the trial court is affirmed except with respect to the amount of damages. The judgment, in so far as it is determinative of that issue, is vacated and the case remanded for a determination and award of damages limited to the 10 ordered cars only, together with such interest and attorney's fee as the trial court may deem proper. It is so ordered.

15. For the provisions of 49 U.S.C.A. § 8, see footnote 5, supra.