CHICAGO, B. & Q. RY. CO. *v.* BURLINGTON, C. R. & N. RY. CO. *et al.*

*(Circuit Court, S. D. Iowa. March 23, 1888.*

1. CARRIERS—COMMON CARRIERS—DUTY TO CONNECTING LINE—BOYCOTTS AND STRIKES—COURTS—FEDERAL JURISDICTION.

The duty imposed upon railroad companies in Iowa by the laws of that state and by the "interstate commerce act," (Act Cong. Feb. 4, 1887; St. at Large 1885-87, p. 379,) of receiving from connecting roads freight and passengers, is one which the federal courts sitting in that state will enforce by mandatory injunction where the injury resulting from its non-performance is continuing; and it is no defense to such relief that a strike of locomotive engineers and firemen has been ordered on plaintiff's road, and that if defendant's road should accept cars from the "boycotted" road its own men would be called out.

2. INJUNCTION—MANDATORY—GRANTING—NOTICE.

As to defendants to a bill who have not been served with notice, and who have not appeared, a mandatory injunction will not issue on motion, but "if there appears to be danger of irreparable injury from delay," within the meaning of Rev. St. U. S. § 718, a restraining order, to be served upon said defendants with notice of the time and place of hearing, will be granted.

In Equity. On motion for injunction.

*Anderson & Davis, (Thomas Hedge, Jr.,* and *Joseph G. Anderson,* of counsel,) for complainants.

*S. K. Tracy,* for defendants.

LOVE, J. Whoever, in my opinion, in a legal proceeding considers a railway company as a corporation for mere pecuniary profit to the owners of the property, without taking into account their character as *quasi* public corporations having public duties to perform, takes a view of the subject altogether narrow and misleading.

It is one of the duties of government to provide and regulate public roads and highways. It is a duty of government because roads and highways are indispensible to society, and because individuals are incompetent to establish and control them. No government can rightfully delegate to individuals or corporations its high duties so far as to place them beyond its own power, supervision, and control. The collection of the public revenue is a duty of government. It has been sometimes delegated to individuals as farmers of the revenue, but no government could rightfully place the collection of the public revenue beyond its own supervision and control. It would be absurd to treat the collection of the public money by farmers of the revenue as a mere private business. They would, on the contrary, have committed to them a public business—a duty of the government, in which the whole people would have a vast interest. So it is with the railway service. It is a *quasi* public business. The building, equipping, and management of a railway is not strictly a private enterprise. It would not be authorized by the government solely for private profit. That could not be done within the law of eminent domain. The railway company, and all who are engaged in the building, equipping, repairing, and keeping open a railroad as a public highway are performing one of the great duties of the government. The govern-

ment for the time being commits to them for the benefit of the whole people a business—a public duty—in the performance of which the people have an interest which is simply incalculable. It is clearly the duty of the government in all its departments, within their respective spheres, to enforce, upon all persons engaged in a business which thus concerns the public welfare, the strict performance of their duty to the public. The stoppage of the running of a system of railways for weeks and months at a time must inevitably inflict enormous injury upon the great public, for whose convenience and use railways are authorized. By the non-operation of a railroad travel may be suspended; the merchant and manufacturer ruined for want of transportation; property of incalculable value laid up to perish by the way; whole communities deprived of their supplies of fuel and the other necessaries of life,—in a word, mischiefs and sufferings may be inflicted upon the people which no words are adequate to express. Who may arbitrarily, in consideration of their own private wrongs or interests, inflict such enormous evils upon the very public by whose license and for whose benefit railways have been authorized and established? Certain classes of men for their own profit engage in a *quasi* public service. They conceive themselves to be wronged, and they proceed to redress their own private wrongs by inflicting incalculable injuries and sufferings upon whole communities of people. This they claim a right to do, not only by quitting the service in which they are employed, but by giving to their leaders the power to order off all other men in the same line of employment from the similar service in which they are engaged. They thus claim the power, by the arbitrary and uncontrollable will of a few leaders, to suspend the operation of a whole system of railways covering vast regions of country! In their view apparently no one is concerned in such a transaction but themselves and the railway company! The great public—the millions and tens of millions of people who may be injuriously affected by such irresponsible proceedings—are left out of view and wholly ignored. To redress the small wrongs of a few they inflict irreparable injuries upon the many.

It would seem that the government ought in some way to protect the public against the evils growing out of such a suspension of railroad transportation. But the remedy for the intolerable injuries which threaten the public, as well as the complainant, in that direction, must rest mainly with the legislative department. The power of the courts is extremely limited. The action at law for damages is clearly no remedy at all, and the power of a court of equity is mainly preventive. The power of a court of chancery to enforce the performance of positive duties is circumscribed within very narrow limits. Thus it cannot prevent the employes of a railway company from abandoning its service. However grievous may be the injury inflicted upon the railway company and the public by the sudden suspension of railway service over an entire system of railways, I see no remedy for it in the restraining power of equity. The court cannot prevent the railway employes from leaving their places, and it cannot compel them to return to work. But here a line must be drawn which the employes may not pass. If, having left the service of the

company, the men attempt in any way by threats, or force, or violence, or intimidation, or unlawful combinations, to interfere with the free will of other men who may be inclined to take their places, or with the property of the company, or with those who are in the management of its affairs, for the purpose of preventing the company from doing its duty to the public as common carriers, the court may undoubtedly interpose its power of granting injunctions to prevent intolerable mischief. Such injuries would be clearly irreparable. There would be no adequate remedy at law. Actions at law would, in such cases, be simply futile, and, even if effectual in particular cases, they would be so multitudinous that the remedy would be as bad as the injuries to be remedied. The employes may quit the service of the company, and give place to other men. But it is a service that must be performed, and it must not be obstructed; and so long as the employes remain in the service, they are, like other men, bound by their contracts. They have assumed by contract to assist in the performance of a *quasi* public service,—a service the non-performance of which may be ruinous to the public,—and it is a serious question whether they may not be compelled while remaining in the *quasi* public service of operating a railway to perform their duty. But, since the company has the power of discharge, equity would not interfere by injunction, except in a clear case of special necessity. I wish to be understood as giving at present no opinion upon this point.

In the next place, what disposition shall be made of the complainant's application for a mandatory injunction against the defendant company and its managing officers compelling them to perform their duty as required by the law of both congress and the state of Iowa? These defendants have appeared by counsel, and admitted the truth of the allegations of the bill, and they do not deny that they are required by law to receive and move the complainant's cars. They admit that they have refused to perform this duty, and they give as a reason for their refusal that, if they receive and haul the complainant's cars, their firemen and locomotive engineers will abandon their service, and leave the company without the means of operating their lines. There can, of course, be no doubt about the law of both the general and state governments requiring the defendant corporation to receive and move the complainant's cars, whether empty or loaded. The law of Iowa provides that it shall be the duty of any railway corporation to receive and transport the empty or loaded cars furnished by any connecting road to be be delivered at any station or stations on the line of its road to be loaded or discharged, or reloaded and returned to the road so connecting. 1 McClain's Ann. St. p. 367, § 10.

The United States interstate commerce act[1] provides that every common carrier shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivery of property and passengers to and from their several lines, and those con-

[1] Act Cong. Feb. 4, 1887; (St. at Large, 1885–87, p. 379.)

necting therewith, and shall not discriminate in their rates and charges between such connecting lines, but shall not be construed as requiring any common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business.

Now, the question is, what shall be obeyed,—the law of the land, or the order of the chiefs of the locomotive engineers? Shall a railway company refuse obedience to the express provisions of the statutory law because some of its employes threaten to quit its service, and thus stop the running of its trains? Shall the court presume that they will carry out such threats, and deny relief to the complainant upon that presumption? No temporary inconveniences to the defendant company, or the public whom it serves are, in my judgment, for one moment to be compared with the fatal consequences which must ensue from a precedent by which it would be established that a railway company may, in violation of the law of the land, refuse to receive and haul the cars of a connecting line, at the command of any irresponsible persons, or from its own belief and apprehension that its employes will leave its service, and stop the operation of its lines. Such an excuse as this is wholly inadmissible, and it must be set aside. If, in this case, the refusal of the defendant corporation to move the cars of the complainant be sustained, it will follow that, whenever in the future the locomotive engineers and firemen shall enter upon a struggle with any one road, all other corporations having connecting lines will, in violation of law, be warned not to interchange cars with the offending road, and compelled to obey the behests of their employes. Thus may the transportation of vast regions of country covered by connecting lines be controlled and paralyzed at the arbitrary will and pleasure of the Brotherhood of Locomotive Engineers. Indeed, it seems to-day to be by the grace of the leaders of this association that the various corporations owning the vast network of railways west of Chicago are permitted to operate their lines. The people of this vast region may at any moment be deprived, by the arbitrary fiat of the association in question, of all railroad facilities. Is this a power fit to be assumed and wielded by any set of irresponsible men under the sun?

There is another matter worthy of consideration by the defendant company. If it refuses to receive and move cars laden with goods or merchandise, will the company not be liable for any damages which may accrue to the owners and consignees of such shipments? Is it not the right of the citizen and owner of goods shipped to have their property received and transported by the defendant as a common carrier, and does not this right belong to the shipper, by both the common and statute law? Suppose the goods, being perishable, should go to destruction by the way; suppose they be ordered for a special purpose, and fail to reach the consignee in time; suppose by reason of the delay caused by the act of the defendant there should be a heavy decline in the market, would not the defendant company be liable to the owner and consignee in damages?

The injury complained of is clearly irreparable, except by the remedy now prayed for by the complainant. It is a continuing injury. It

may occur every day, and many times a day. This complainant is a common carrier, and cannot refuse to receive and carry goods destined to persons living or doing business upon the defendant's line. Yet the complainant must either refuse to receive such goods, and abandon all its business connected with the defendant's line, or receive them and allow them to accumulate upon its own tracks, or in warehouses at the place of connection between the two roads.

The mandatory injunction against the defendant company and its chief officers as prayed for will be granted, to continue in force till the next session of the court to be held at Keokuk on the 24th day of the present month, upon the complainant giving bond in the sum of $5,000, to be approved by the clerk of the court. The clerk will approve the bond, and issue the writ. No temporary injunction can now be granted against the defendants who have not been served with notices, and who have not appeared, but the order is that the application for the same be set down for hearing on the same day, (March 24th,) at Keokuk, at 9 o'clock A. M., and that in the mean time a restraining order in accordance with the provisions of section 718, Rev. St. U. S., be issued and served upon said defendants, with notice of the time and place designated for the hearing. The clerk will issue the same in accordance with the order signed and filed herewith.