BURLINGTON TRANSPORTATION COMPANY et al., Appellees, v. GORDON HATHAWAY et al., Appellants.

No. 46246.

DECEMBER 14, 1943.

Connolly, O'Malley & McNutt, of Des Moines, for appellants.

J. C. James and Russell B. James, both of Chicago, Illinois, and Clark, Pryor, Hale & Plock, of Burlington, for appellees.

MULRONEY, C. J.— Each of the plaintiffs is a common carrier of freight, by means of motor vehicles, operating to and from Burlington, Iowa. Their drivers belong to the defendant Local Union No. 218 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, hereinafter called the union. The defendants Gordon Hathaway and Roy Tweedell are business agents of the union.

John Blaul's Sons Company is a wholesale grocery company located in Burlington, whose truck drivers do not belong to the union. The defendant union, in its effort to unionize the Blaul Company, established a picket line around the latter's place of business and instructed plaintiffs' drivers not to handle Blaul merchandise. This latter action was the subject of the injunction suit which resulted in the temporary and permanent injunction enjoining the defendants "from requiring plaintiffs' employees who are members of said Union to refrain from handling or delivering merchandise consigned to or from John Blaul's Sons Company." Defendants appeal.

The record shows that Gordon Hathaway called upon the Blaul Company several times and informed them that he was instructed by his union to seek a labor contract with them. When he was finally told that the company would not negotiate with him unless the union represented a majority of the employees, the union placed the Blaul Company on the unfair list of the union and passed a resolution not to haul or work upon any merchandise of that company. There was evidence that plaintiffs' drivers did refuse to haul Blaul merchandise; that it piled up on plaintiffs' docks; that Blaul continued to offer

merchandise to plaintiffs for shipment and plaintiffs' employees refused to handle it; that Tweedell and Hathaway placed signs on the merchandise on the docks bearing the legend that the merchandise was unfair to Local 218; that plaintiffs' employees said they would not handle Blaul merchandise for they were afraid that, if they did, they would be blackballed by the union; that on one occasion Hathaway informed plaintiffs' employees they could handle some of Blaul's perishable merchandise on the docks but they were not to handle any more. There was no evidence of any acts of violence upon the part of defendants.

I. Upon this record one clear reason for the granting of the injunction is readily apparent. The concerted action of the defendant union had for its object an act prohibited by law. The plaintiffs are all common carriers and as such they were bound to carry property tendered by the public for shipment. The rule is thus stated in 13 C. J. S. 61, section 27:

"Both under and apart from statutory provisions to that effect, every common carrier is under a duty to receive for transportation and to transport the property of any person tendered to it for transportation, provided the property is such as it holds itself out as willing to carry, or as it usually carries."

See, also, State ex rel. Board of Railroad Commrs. v. Rosenstein, 217 Iowa 985, 252 N. W. 251; Cobb, Blasdel & Co. v. Illinois Cent. R. Co., 38 Iowa 601.

When the plaintiffs obtained their permits to operate as common carriers they undertook the duty to transport the freight which the public tendered to them for transportation. The failure to carry out this duty to transport would not be excused by showing that its employees refused to obey the employers' orders. See Chicago, B. & Q. Ry. Co. v. Burlington, C. R. & N. Ry. Co., 34 F. 481, and Consolidated Freight Lines, Inc. v. Department of Public Service, 200 Wash. 659, 662, 94 P. 2d 484, 485. In the last-cited case a strike of laundry workers at the Davenport Hotel in Spokane resulted in a picket line around that hotel. Certain common-carrier truck lines, who had been serving the hotel in the capacity of picking up freight or baggage and delivering it anywhere in the state of Washington or in the channels of interstate commerce, refused to send their

trucks through the picket line at the hotel because the local manager of the teamsters' union threatened to call a strike of the carriers' drivers if they were permitted to go through the picket line. The hotel filed a complaint with the department of public service against the carriers for the cancellation of their permits as common carriers. This resulted in an order suspending temporarily the permits under which the carriers operated. Upon appeal the action of the commission was affirmed, the Supreme Court of Washington stating:

"The question then arises whether the appellants were excused by reason of the law. They being common carriers, it was their duty, under the facts and circumstances of this case, to send their trucks through the picket line. 13 C. J. S. 407; I Moore on Carriers (2d ed.), 124; Chicago, B. & Q. R. Co. v. Burlington, C. R. & N. R. Co., 34 Fed. 481; Burgess Bros. Co. v. Stewart, 112 Misc. 347, 184 N. Y. Supp. 199."

For authorities holding a shipper is entitled to a mandatory injunction to compel the carrier to transport his goods when the carrier's excuse is that his employees have been ordered by their union not to handle the shipper's goods, see Buyer v. Guillan, 2 Cir., N. Y., 271 F. 65, 16 A. L. R. 216; annotation 6 A. L. R. 909; 31 Am. Jur. 1000, section 339.

Section 8044, Code of 1939, provides:

"It shall be unlawful for any common carrier to * * * entail any prejudice or disadvantage upon any particular person, company, firm, corporation * * * by any * * * practice whatsoever * * *."

Section 13251, Code of 1939, provides:

"All persons within this state shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of * * * public conveyances * * *."

And section 13252 makes the denial of the rights guaranteed by section 13251 punishable by fine and imprisonment.

From the above it is clear that if the plaintiffs were to do that which the union sought to compel them to do, namely, not handle the Blaul merchandise, they would be doing an act pro-

hibited by the common law and the statutory law of this state and an act that could subject them to criminal prosecution.

II. We are not impressed with any argument based upon a distinction between the "immediate" and "ultimate" object of the union action. It is true that the ultimate object was to coerce a labor contract with the Blaul Company, but, conceding this to be a legitimate action on the part of the union, nevertheless, the object of the collective union action, insofar as these plaintiffs are concerned, was to compel these plaintiffs to perform illegal acts. The only alternative given to the plaintiffs was the performance of those illegal acts. See American Law Institute, Restatement of the Law, Torts, section 777d, where the rule is stated:

"* * * the object of concerted action is determined in relation to the person against whom the action is directed and who, by performance of the required act, can secure a termination of the action. * * * When a single course of action is directed toward more than one person, its object may be different with reference to each of the persons."

III. Since the object of the concerted action of the defendant union was unlawful, the concerted action could be enjoined even though the means employed were peaceful. In Bloedel Donovan Lumber Mills v. International Woodworkers, 4 Wash. 2d 62, 72, 102 P. 2d 270, 274, the employer entered into a closed-shop agreement with the union which had been certified by the National Labor Relations Board as sole collective-bargaining agent of the employees. When a minority union picketed the employer, the Washington Supreme Court held it was rightly enjoined, stating:

"While we do not wish to be understood as holding that any individual employee, or group of employees, may not at any time present grievances to respondent, in the manner provided in the working agreement, we are firmly of the opinion that Local 46 [the minority union] has no legal standing, in so far as respondent is concerned, either to insist on negotiating with respondent relative to the claimed grievances of some of its

members, or to legally authorize the picketing of respondent's plants."

Much the same situation existed in R. H. White Co. v. Murphy, 310 Mass. 510, 519, 520, 38 N. E. 2d 685, 690, 691, decided January 2, 1942. Here the employer signed a closed-shop agreement with the union that did not represent the majority of his employees, and the contract was executed while proceedings for certification of a collective-bargaining agency were pending before the State Labor Relations Commission. When the commission decided that another union was the collective-bargaining agent, the first union sought to coerce the enforcement of its labor contract by peaceful picketing. The court held the picketing was rightly enjoined, and stated:

"The defendants have relied largely upon Thornhill v. Alabama, 310 U. S. 88 [60 S. Ct. 736, 84 L. Ed. 1093], Carlson v. California, 310 U. S. 106 [60 S. Ct. 746, 84 L. Ed. 1104], and American Federation of Labor v. Swing, 312 U. S. 321 [61 S. Ct. 568, 85 L. Ed. 855], in support of their contention that peaceful picketing though for an unlawful purpose is not itself unlawful, and may not be enjoined. We do not adopt this view, being of opinion that there is nothing in those cases to support the proposition that freedom of speech includes the right, by picketing, to persuade or induce an employer to violate the statute by engaging in an unfair labor practice, and thus to set at naught the declared public policy of the Commonwealth, the foundation of the statute itself. In none of these cases just referred to was the picketing carried on for an unlawful purpose. * * * We are of opinion that none of the cases relied upon by the defendants, which we have already discussed, is authority for any principle that picketing by workmen in concert to persuade or induce an employer to do an unlawful act, one condemned by statute as an unfair labor practice and contrary to the defined public policy of the Commonwealth and of the nation, is permissible under the constitutional guaranty of freedom of speech, or otherwise."

See, also, American Law Institute, Restatement of the Law, Torts, section 794, where the rule is stated:

"An act by an employer which would be a crime or a violation of a legislative enactment or contrary to defined public policy is not a proper object of concerted action against him by workers." And the comment under the above rule, stating: "The expression of public policy is not confined to legislation and criminal law; in passing upon the propriety of an object, public policy otherwise defined is an important factor. If the object is an act against which the law has definitely set its face, it is not a proper object of concerted action."

There was no labor dispute between plaintiffs and their employees or between plaintiffs and the defendant union. The union cannot concertedly exert, in aid of their labor dispute with Blaul, any economic pressure to compel these plaintiffs to do that which the law and public policy forbid. The injunction was rightly issued.

What we have here said renders unnecessary any discussion of the legality of the union action against Blaul. Nor do we need to comment on the argument advanced by plaintiffs' counsel that the union action amounts to a violation of existing labor contracts between plaintiffs and the union. The evidence fails to show such contracts existed at the time the injunction was granted. The judgment of the trial court is affirmed.—Affirmed.

MILLER, SMITH, BLISS, GARFIELD, OLIVER, WENNERSTRUM. and MANTZ, JJ., concur.

HALE, J., takes no part.