**GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 89 et al. v. AMERICAN TOBACCO CO., Inc.**

Court of Appeals of Kentucky.

June 2, 1953.

As Modified on Denial of Rehearing
Feb. 5, 1954.

Hardy & Logan and Robert Zollinger, Louisville, for appellants.

Nelson Helm, Stites, Wood, Helm & Taylor, Louisville, for appellees.

STEWART, Justice.

Two questions are presented for determination on this appeal and cross-appeal:

1. Are the pickets around the property of the American Tobacco Company, herein referred to as "American," at 17th and Broadway Streets in Louisville, involved in primary or secondary picketing, since the strike is conducted at the same address against American Suppliers, Incorporated, herein called "Suppliers"?

2. May a driver of a common or contract carrier be compelled against his wishes by injunctive process to cross a picket line advertising a lawful strike, when the driver is a member of the same union that is conducting the strike but he is not on strike himself?

We have chosen to consider the cross-appeal, or question No. 1, first.

On March 30, 1952, Local Union No. 89 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America of the American Federation of Labor, hereinafter referred to as "Local 89" for the sake of brevity, called a strike against Suppliers and threw picket lines around four of its establishments in Louisville, viz.: A redrying plant at 9th and Magnolia Streets; an office with a small warehouse attached at 908 South 8th Street; a group of warehouses at 7th Street and Arcade Avenue; and a "stemmery" situated upon American's property at 17th and Broadway Streets. Suppliers is a subsidiary of American, but it is not a party to this appeal.

It is the picketing on all sides at the last mentioned location that is the bone of contention. The stemmery is situated on ground owned by American and is completely surrounded by American's cigarette factory, its auxiliary structures and its fences. American maintains that its main gates are on Broadway and that they are not and have never been used for ingress and egress of either personnel or materials

of Suppliers except to some small extent. On the other hand it states that access can be had to Suppliers for all purposes from 17th Street. It is therefore perfectly practical, American argues, to set aside the entire side on Broadway for its exclusive use and thereby prevent it from becoming entangled in the labor dispute that exists only between Local 89 and Suppliers. Furthermore, American asserts it is engulfed in this controversy solely because of its corporate and geographical relations with Suppliers, but that there is not now and there has never been any affiliation between its employees and Local 89, so that it is being subjected to a secondary boycott by the conduct of the union, and that the sphere of picketing can and should be restricted to the disputants in such a manner as to relieve it from the damaging results that flow therefrom. Local 89 takes the position that the picketing is primary, proper and legal. The Chancellor adopted the view of Local 89, and American has cross-appealed from the judgment in this respect. Accordingly, we must search the record to resolve whether this finding has a reasonable basis in the evidence.

We have mentioned the physical layout of the stemmery. Aside from this, American and Suppliers have an economic interdependence; or, it might be said that Suppliers is the child of American, its parent, because the latter owns all the capital stock of the former. Suppliers buys raw tobacco and puts it through a certain process at the stemmery. The tobacco is then transported from the stemmery to American's cigarette factory by means of a conveyor belt which runs from one to the other. Suppliers sells all its tobacco to American. It was brought out that American owns not only the land but the improvements employed by Suppliers in the operation of the stemmery. There was testimony that Suppliers leased the ground and the plant and paid rent to American for the use of the same; however, the terms of the lease and the amount of the rent were unknown to the local officials of either corporation. A central power plant on the property supplies steam to the

facilities of both corporations, Suppliers paying for this service. The trucks of Suppliers display advertisements of "Lucky Strike," a well-known manufactured product of American. Over the entrance of another plant of Suppliers at 7th Street and Arcade Avenue, which is not immediately connected with this litigation, the name on the sign reads: "American Tobacco Company." At times employees of Suppliers work for American and the latter pays the former for such services. Employees of Suppliers also receive four packages of American-made cigarettes as a part of their weekly compensation. If an employee of Suppliers is badly injured or becomes seriously ill, that person is sent to American's hospital for treatment. To sum up, Suppliers and American operate as a unit, except that each is a corporate entity and each is under separate management locally.

In the light of the foregoing factual background, we are confronted with this question: Is American a neutral in the existent dispute between Suppliers and Local 89? The test to be applied in arriving at a proper conclusion on this point may be thus stated: "An important factor in determining whether the activities of a union against an employer other than the one with which the union has a labor dispute come within the purview of the secondary boycott provision is the relationship between the two employers. If the relationship is so close that one may be regarded as the 'ally' of the other, picketing of one may be permissible during a labor dispute with the other." See 16 A.L.R.2d, paragraph 6, page 778.

In the recent case of Local No. 181, etc., v. Broadway & Fourth Avenue Realty Co., Ky., 248 S.W.2d 713, 715, a strike involved a corporation which owned and operated the Brown Hotel and the Kentucky Hotel and another corporation which owned and operated the Martin Brown Building, all located in Louisville. Both corporations were, except for qualifying shares, entirely owned by Mr. Graham Brown. In that case, in passing on a contempt proceeding, we not only treated the whole controversy as a single labor dispute but we considered Mr. Graham Brown and the two corporations as in reality one and the same. There we said:

"Supporting the conclusion that this is in the broad sense one labor dispute, is the fact that when the strike first commenced, picketing was begun at the Martin Brown Building, as well as the two hotels, although at that time there was no claim of a labor dispute affecting the employes of the Martin Brown Building.

"In the eyes of the public, this has been a strike against Mr. Graham Brown, and the acts of violence have been committed by persons having a labor dispute with Mr. Brown."

We think the industrial alliance between Suppliers and American is so close that both may be considered as one operation. From the standpoint of physical set-up the two are so enmeshed that they cannot be split apart without doing violence to both. To suggest that American has no interest in the dispute between Suppliers and Local 89 is to look at the form and remain blind to the substance. Nor can the naked claim of corporate separability be raised as a bar to picketing the primary employer at 17th and Broadway Streets. To remove the pickets from any side of this property would be to remove them from Suppliers at that location. It cannot, therefore, be said that American is a neutral under the circumstances and that the picketing amounts to a secondary boycott at the above address. We conclude that the Chancellor correctly disposed of this issue.

Local 89 seeks by its appeal to nullify so much of the injunction as requires a driver of a common or contract carrier to cross against his will a picket line where a strike is in progress. It so happens in this instance that the carrier employees are members of the same union as those conducting the strike against Suppliers. It should be emphasized, however, that they refuse to handle freight for American while remaining in the service of their employer.

The rule of law that common carriers and their employees must serve all members of the public without discrimination is firmly established in Kentucky and, so far as we can find, in all the states. Its origin goes far back into the common law. Section 196 of the Constitution of Kentucky embodies the principle in this language: "Transportation of freight and passengers by railroad, steamboat or other common carrier, shall be so regulated, by general law, as to prevent unjust discrimination. No common carrier shall be permitted to contract for relief from its common law liability." Subsections 1 and 2 of KRS 281.685 read in part that no common or contract carrier shall "subject any person to any unreasonable discrimination." KRS 281.990 (1) stipulates that any person who "violates, or causes, aids or abets any violation of, any of the provisions of this chapter", which includes KRS 281.685 (1) and (2), "shall be fined not less than fifteen dollars nor more than two hundred dollars, or imprisoned for not more than thirty days or both."

See also 9 Am.Jur., Carriers, section 286, pp. 607–608, and 13 C.J.S., Carriers, § 27, pp. 61–62.

In Burlington Transp. Co. v. Hathaway, 1943, 234 Iowa 135, 12 N.W.2d 167, 169, 149 A.L.R. 1238, a suit was brought by certain common carriers as plaintiffs against the teamsters, chauffeurs, warehousemen and helpers union and its business agents as defendants to enjoin the latter from requiring employees of the union to refuse to handle the goods of John Blaul's Sons Company, a wholesale grocery company in Burlington, Iowa, which the union was attempting to organize. A picket line had been thrown around the grocery company and the employees of the union refused to transport freight for the grocery company. The Iowa statute as to non-discrimination by carriers is similar to Kentucky's. The substance of the court's decision is as follows:

"When the plaintiffs obtained their permits to operate as common carriers, they undertook the duty to transport the freight which the public tendered to them for transportation. The failure to carry out this duty to transport would not be excused by showing that its employees refused to obey the employers' order. See Chicago B. & Q. R. Co. v. Burlington, C. R. & N. Ry. Co., C.C., 34 F. 481, and Consolidated Freight Lines, Inc., v. Department of Public Service, 200 Wash. 659, 94 P.2d 484, 485. In the last cited case a strike of laundry workers at the Davenport Hotel in Spokane resulted in a picket line around that hotel. Certain common carrier truck lines, who had been serving the hotel in the capacity of picking up freight or baggage and delivering it anywhere in the State of Washington or in the channels of interstate commerce, refused to send their trucks through the picket line at the hotel because the local manager of the teamsters' union threatened to call a strike of the carriers' drivers if they were permitted to go through the picket line. The hotel filed a complaint with the Department of Public Service against the carriers for the cancellation of their permits as common carriers. This resulted in an order suspending temporarily the permits under which the carriers operated. Upon appeal the action of the Commission was affirmed, the Supreme Court of Washington stating: 'The question then arises whether the appellants were excused by reason of the law. They being common carriers, it was their duty, under the facts and circumstances of this case, to send their trucks through the picket line. 13 C.J.S., Carriers, p. 407, § 202; Moore on Carriers, 2d Ed., Vol. 1, p. 124; Chicago, B. & Q. R. Co. v. Burlington, C. R. & N. Ry. Co., C.C., 34 F. 481; Burgess Bros. Co. v. Stewart, 112 Misc. 347, 184 N.Y.S. 199.'

\* \* \* \* \* \*

"From the above it is clear that if the plaintiffs were to do that which the union sought to compel them to do, namely, not handle the Blaul merchan-

dise, they would be doing an act prohibited by the common law and the statutory law of this state and an act that could subject them to criminal prosecution.

\* \* \* \* \* \*

"There was no labor dispute between plaintiffs and their employees or between plaintiffs and the defendant union. The union cannot concertedly exert, in aid of their labor dispute with Blaul, any economic pressure to compel these plaintiffs to do that which the law and public policy forbid. The injunction was rightly issued."

These cases support the rule laid down in the Hathaway case: Pacific Gamble Robinson Co. v. Minneapolis & St. Louis R. Co., D.C.Minn.1952, 105 F.Supp. 794; Northwestern Pacific R. Co. v. Lumber & Sawmill Workers Union, etc., 1948, 31 Cal. 2d 441, 189 P.2d 277; Turner v. Zanes, Tex. Civ.App.1947, 206 S.W.2d 144.

Counsel for Local 89 admit that the Hathaway case correctly sets forth the law on the issue raised by the appeal as of the date it was decided, namely, in 1943, but they insist that the Labor-Management Relations Act of 1947, commonly called the Taft-Hartley Act, 61 Stat. 136 (1947), 29 U.S.C.A. § 151 et seq., makes the question under discussion one exclusively controlled by this enactment. To fortify this position, reliance is had upon this part of 29 U.S. C.A. § 158, also known as 8(b) (4) (D) of the Act, which is as follows: " * * * Provided, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by representative of such employees whom such employer is required to recognize under this subchapter."

■ The appeal involves the refusal of employees of common or contract carriers who are not on strike but who happen to belong to Local 89, the bargaining representative of Suppliers' employees, to transport the merchandise of American through the picket line at 17th and Broadway Streets, and this disobedience is not complained of as an unfair labor practice but as a violation of the common law, the statutory law and the Constitution of Kentucky. Aside from this, as we have shown, the illegal conduct of the employees could subject them to criminal prosecution. We find nothing in the provisions of the above Act nor in the decisions of the Supreme Court of the United States construing it that makes such conduct legal when from time immemorial the several states have branded it as illegal. Furthermore, the Supreme Court has taken the position that federal jurisdiction cannot be invoked to protect a course of action, such as that in this case, that would be in conflict with the declared public policy of a state. See Local Union No. 10 v. Graham, 344 U.S. 811, 73 S.Ct. 16, 97 L.Ed. 632, and the cases cited therein. It follows that the portion of the injunction requiring performance of the duty to carry American's goods in no way impairs the right to strike, the right to picket or any other right guaranteed by the federal law or the Constitution of the United States but that the order does, on the contrary, enforce obedience to the statutory law and the Constitution of the Commonwealth and, as a consequence, it was proper.

■ Finally, the employees of the carriers rely upon a provision of the agreement between themselves and their employers covering the period from February 1, 1952, to January 31, 1955, to the effect that it shall not be a violation of their contract or a cause for discharge to refuse to go through the picket line of a union or to refuse to handle unfair goods. They insist that this stipulation excuses them from serving American. The legal duty of a common carrier to handle the merchandise of a shipper without discrimination existed long before the contract came into being, and, by like token, employees of such carriers, as long as they voluntarily remain in the hire of their employers, do not have the lawful right to withhold their services from a particular customer who deals with

their employers. Here the common carriers and its employees seek by a contractual provision to avoid the responsibility imposed by a statute which implements a constitutional provision, and we hold that such a contractual stipulation is void.

The question of whether a contempt has been committed is left for the Chancellor's determination. Our reason for this ruling is that the contempt, if any, is continuous in its nature and should not be handled piecemeal. Besides, the Chancellor is on the ground, is familiar with the background of this suit and is in a better position to hear the evidence; therefore, this phase of the case can be more expeditiously handled for all concerned in the lower court.

It appears to us that an emergency exists in this case and a mandate shall issue forthwith without prejudice to the right to file a petition for a rehearing.

The judgment is affirmed on the appeal and on the cross-appeal.