STANDARD OIL COMPANY, an Ohio Corporation, Plaintiff, v. OIL, CHEMICAL & ATOMIC WORKERS INTERNATIONAL UNION, AFL-CIO et, Defendants.

Common Pleas Court, Cuyahoga County.

No. 697574.   Decided July 1, 1957.

McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, by Maurice F. Hanning and King Rosendale, for plaintiff.

Metzenbaum & Schwartz, by Howard Metzenbaum and Melvin Pearlman, for defendants.

## OPINION

By THOMAS, J.:

This may seem a little late in the day to open Court, but I am

prepared now to render the decision on the case that has been on trial this past week.

Plaintiff, Standard Oil Company of Ohio seeks a permanent injunction against certain concerted activities of the Defendants, Oil, Chemical & Atomic Workers International Union, its Local Union 11-395 and certain individual members and representatives of said Union, which concerted activities have been carried on and undoubtedly will be carried on unless permanently enjoined. This activity is in furtherance of the present strike of the Company's refinery workers, the strike being primarily one to secure retroactivity of an agreed wage increase.

Specifically, the Company requests a permanent injunction prohibiting picketing or any other concerted activity directed at the employees of the Company's distribution centers who are members of the Independent Petroleum Workers, Inc., and which activity the Company says is inducing the breach of a collective bargaining agreement presently existing between the Independnt Petroleum Workers, Inc., and the Company, and which agreement, among other provisions, contains a no-interruption and no-stoppage-of-work clause.

The Defendants, by their answer and by the positions taken during the trial of this case, oppose the injunction on two main counts.

First, the Defendants urge that since the business of the Company is interstate in character, this Court is without jurisdiction to issue an order in this case because of the claimed pre-empting and exclusive effect of the Labor Management Relations Act of 1947, better known as the Taft-Hartley Act.

Second, the Defendants urge that even if this Court should hold it has jurisdiction to act, no injunction should be issued in any event against peaceful picketing and concerted activities carried on at the Company's distribution centers. And, further, they deny that such picketing if carried on will necessarily induce a breach of the agreement between the I. P. W. Incorporated and the Company.

The significant facts of this controversy are undisputed.

(1) It is admitted that beginning June 7th, the first day of the strike, the East 49th Street Distribution Center, operated by the Company, was picketed by members of Local 11-395 at the direction of the International and Local Unions at, geographically speaking, the intersection of East 49th Street and the separate entrance driveway and the separate exit driveway which leads west from East 49th Street into this very large bulk and distribution center, known as the Sohio Distribution Center, and located at 4800 East 49th Street.

(2) This picketing was carried on between June 7th and June 12th by a varying number of pickets. According to the photographs introduced in evidence and according to the testimony, these pickets have varied in number from, perhaps, four to six to ten to twenty and on the morning of the 12th, the undisputed testimony of one witness was that the number reached a figure of 50 to 75.

(3) It is established in the evidence that at no time was there any physical abuse or were the truck drivers physically affected by the picketing. In terms of personal violence, this record is entirely and completely devoid of any showing of any such violence.

(4) It is established that as the tank trucks either approached the exit to go out onto 49th Street or approached the entrance to return into the Sohio Distribution Center, pickets either by what they said to the drivers or in some instances by walking in front of the trucks, would cause or get the trucks to stop. And following the stoppage of these trucks there would be conversations between the pickets and the drivers. On various occasions the old word "scab" was used over and over again as well as certain other epithets which are, perhaps unfortunately, part of the parlance of the picket line.

There were certain individual cases which do not certainly figure in my decision. There were some claimed individual threats made, but I don't find that those constituted any planned or designed acts on the part of the Defendants.

(5) Coming now then to the fifth finding of fact. On the 7th and 8th of June a number of the drivers refused to cross the picket lines with their trucks. On Monday, the 10th of June, a larger number of drivers ceased operating and finally things ground to a stop on the 11th and nothing moved at all. Likewise on the 12th.

(6) During the morning of the 12th Judge Charles W. White, of this Court, granted the Company's request for a temporary restraining order. The Defendants were served by about noon or soon thereafter on the 12th with a temporary restraining order.

(7) Evidence shows that this restraining order was immediately explained to the truck drivers, and that by 2:00 o'clock in the afternoon, when the picketing ceased, the trucks started to roll again.

(8) The eighth finding of fact is that operations continued at full tilt until about 5:45 in the afternoon, when the pickets reappeared. Again the drivers refused to cross the picket line until the picketing ceased.

That evening, the 12th, or the next morning of the 13th, it is not exactly clear in my mind from the evidence, which is true, but by the morning of the 13th picketing stopped completely, has not been resumed, and ever since the operations of the Sohio Distribution Centers have been continued at full production.

(9) The ninth finding of fact. On March 18, 1957, a collective bargaining agreement was signed by the Company and the Independent Petroleum Workers, Inc. This was for one year, beginning March 18, 1957. The recognition clause of that contract provides, and this is Section 2:

"The Union having been certified by the National Labor Relations Board pursuant to an election conducted on July 15, 1946," and then the representation case number is given, "and pursuant to an election conducted on April 5, 1955, the Company recognizes the Union as the sole and exclusive collective bargaining representative for all maintenance and operations employees of the Cleveland Sales Division, including drivers. bulk station agents, except the agent at Noble Bulk Station, loaders, warehousemen, garage men, watchmen, recappers and maintenance employees, including burner service * * *." And then the section continues to describe the units covered by the recognition section.

So clearly it has been established in the evidence that this Union was and is the bona fide bargaining representative of the employees of the Sohio Distribution Centers and other centers.

That same contract contains a clause, Section 12, which reads as follows:

"Strikes and lock-outs."

"(a) During the life of this Agreement there shall be no interruptions or stoppages of work by the Union through strikes, slow-downs, sit-downs or otherwise and there shall be no lock-outs by the Company."

"(b) Any employees found by the Company to have violated (a) shall be subject to discharge, provided, however, he shall have the right of recourse under the grievance procedure hereinbefore set out."

(10) On the average about 50 Sohio tank trucks driven by 180 drivers, work in and out of the Sohio Distribution Center during the course of a day.

There are, in addition, some tank trucks of independent haulers, two or three especially were mentioned, which also haul products from that facility. But it seems clearly from the evidence that the business of this center is largely devoted to supplying Sohio's own tank trucks. These trucks in turn transport petroleum products to service stations throughout Cuyahoga County, both company owned and operated and dealer operated, and they also haul fuel oil to a large number of residences and people, to hospitals, schools, commercial establishments and other public institutions.

We come then to the first question which this Court must decide. Granted that this Court has the power to grant an injunction in this case, does it have the jurisdiction to do that? Or putting the question a little differently, has the power of this Court to grant an injunction in this type of case and under the subject matter of this case been divested by the Taft-Hartley Act?

In the unending task of integrating the activities of our National Government with those of our State Governments, so necessary if our Union is to be preserved and to endure, no more troublesome problems have confronted the Courts of our country than the problems of the type that now faces this Court.

In the post Taft-Hartley era, ten years this year, many decisions on this very question have been handed down by the Supreme Court of the United States and by a lot of Courts at the bottom of the pyramid, just like this Court, and by many Courts in between. These I have been reading and seeking to reconcile, while this case was in progress, and since I last saw you on Saturday.

It seems to me that it is possible, and certainly necessary for a proper decision of this case, to classify these decisions of the Supreme Court bearing on this delicate relationship between Federal, and State Court and agencies in labor management matters.

There is one class of cases in which peaceful picketing seeks to accomplish objectives which may be unfair labor practices under the Taft-Hartley Act, more particularly under Section 8(b) of the Act applying to Unions. And in this case the Supreme Court has held that the exclu-

sive responsibility, in the first instance of providing the remedy and enforcing the remedy lies with the National Labor Relations Board. And in such cases State Courts are told to stay out, "this is not your preserve."

An example of this class, of course, is the case of Garner v. Teamsters Union, 346 U. S. 485 (1953). There, in a rather small operation, in Pennsylvania, the Teamsters Union attempted, unsuccessfully, to organize the workers at this truck terminal. They having failed, they obtained some strangers, members of the Union, but not working there, to picket this location. And after a while, because of that, truck drivers who belonged to The Teamsters refused to cross the picket line. And eventually the case indicated that the economic effect was so drastic that about 95 per cent of the business of this company was lost.

The State Court granted an injunction against that activity. The Supreme Court of Pennsylvania reversed; the Supreme Court of the United States affirmed the Supreme Court of Pennsylvania. They did so on the basis that here was a situation in which the employer had a remedy under the Taft-Hartley Act. The facts indicated that interstate commerce was affected and that, at least, the Board could have taken jurisdiction of the case. And, there, the Supreme Court of the United States held that the State Court was divested of jurisdiction and could not issue an injunction.

Here are just some of the court's words, but I think they help to summarize the Supreme Court's point of view in that case:

"On the basis of the allegations, the petitioner could have presented the grievance to the National Labor Relations Board. The respondents were subject to being summoned before that body to justify their conduct. We think the grievance was not subject to litigation in the tribunala of the state."

There are three recent decisions, which extend the Garner doctrine far indeed. The first is the case of Guss v. Utah Labor Board, 353 U. S. 1 (1957). This involved a dispute in Utah between the Steel Workers and a manufacturer of photographic equipment. He was supplying one of the defense agencies with equipment. In the course of efforts to organize the plant, the Steel Workers petitioned and obtained a collective bargaining election under the NLRA, under the Taft-Hartley Act. And in that election the Steel Workers won the election and were certified as the bargaining representative.

Thereupon they said, "O. K., Mr. Employer, let's start doing business." Well, that went along and nothing happened. The employer didn't do business. He wouldn't, apparently, enter into any kind of a collective bargaining agreement. And so the Union filed a charge with the National Labor Relations Board. This was in 1954, and about this time the Labor Board decided there had to be some line drawn in terms of whether or not they would take jurisdiction of every local dispute, even though it might affect interstate commerce.

The Board fixed $1,000,000 as a minimum. This Company's business was less than $1,000,000 in interstate commerce, and the Board declined further jurisdiction.

Thereupon, the Union went to the Utah Labor Relations Board and

said, "Well, if the National Board won't take it, surely, you will take it." And the Utah Board did.

They processed it and found the employer guilty of an unfair labor practice. The Utah Supreme Court affirmed it and then it went up to the Supreme Court of the United States. There, on March 25th of this year, Chief Justice Warren reversed.

He did so on the proposition that, as he put it:

"This involved a matter in which the National Labor Relations Board had jurisdiction under the Act. It did affect commerce. It did involve an unfair labor practice under the National Act. Therefore, unless there was a cession of jurisdiction by the National Board to the State Board under Section 10(a) of the Act, the State Board was not free to step in."

And even though the National Board had declined jurisdiction and he conceded there was a No Man's Land left where neither Board could act, and this caused Justice Burton no end of concern, still he found that uniformity under the Federal Act is so necessary that we can't have the State Board try to decide what the National Act means or a state replica of the National Act. So the Supreme Court reversed and denied the injunction and denied the order and, apparently, nothing has happened since.

The other case, the second of the three cases, involved a situation right here in Ohio. It is Meat Cutters v. Fairlawn Meats, 353 U. S. 20 (1957). There you have a situation where three meat markets were under a process of organization by the Meat Cutters Union.

The Meat Cutters attempted to get membership in these meat markets without success, without very much success, at least. And having failed to organize them, they then made a demand on the employers for a union shop and for a right to represent the employees of the three meat markets.

Here you had meat markets who bought about $100,000 worth of meat outside of the State of Ohio each year. The employers did not attempt to go to the National Board, but they did not only attempt, they did go to the Summit County Court of Common Pleas. The Summit County Court of Common Pleas found there was no labor dispute and although the picketing was peaceful, it was illegal and granted an injunction.

The case went on its way. It was affirmed by the Summit County Court of Common Pleas and the Court of Appeals affirmed and the Supreme Court of Ohio affirmed and then it went up to the top Court in Washington. And there the Supreme Court of the United States, on the authority of the Guss case, reversed the Ohio Courts and held that no injunction should have been issued, and this was the reasoning of the Supreme Court of the United States. It held, and I will just use the majority's exact words at page 23.

"On this view of the case our decision in Guss v. Utah Labor Relations Board controls. If the proviso to 10(a) of the Act," the one concerning cession authority, "operates to exclude state labor boards from disputes within the National Board's jurisdiction in the absence of a

cession agreement, it must also exclude State Courts." And then this important point. "The conduct here restrained," and that is by the Akron Court, "an effort by a Union not representing a majority of its employees to compel an employer to agree to a Union shop contract is conduct of which the National Act has taken hold. Sect. 8(b)(2). Garner v. Teamsters Union, teaches that in such circumstances a State cannot afford a remedy parallel to that provided by the Act."

Hence, if the Act prohibits a certain practice or takes hold of a certain conduct of a Union, to use the Court's language, then the NLRB has the exclusive remedy unless ceded by the National Board to a State Board or a State agency.

And the justification that the Court relies on is that there must be uniformity in the administration of the National Labor Relations Act. That is the first classification of cases.

There is a situation in which the Union pulls out the stops and engages in violent conduct, perhaps in connection with or growing out of mass picketing or at the homes of the working employees. It doesn't make any difference what the violent conduct might be.

What has the Supreme Court done about that? Well, they have carved out an exception to the rule in the Garner case. It was actually carved out in the days of Allen Bradley Local v. Wisconsin Employment Relations Board, 315 U. S. 740, and before Taft-Hartley was passed.

They say that even though in the case of violence the employer has a remedy, and can go to the National Labor Relations Board for a remedy, that fact still doesn't divest a State Court of jurisdiction to exercise its equity powers.

And the reason and thinking of the Court is, as I understand it, that traditionally the states have been the guardians of public peace. The states have the responsibility to maintain law and order, to use the shortest wordage.

Therefore, where unlawful violence, mass picketing or things of that type occur, which the Courts have found to be unlawful, a State Court can step in and grant an injunction even though the employer could have gone to Washington and filed an unfair labor charge against the Union. That is the second classification.

Then there is the third classification. This involves situations where concerted activity, including the right to strike is protected. Clearly, under the Taft-Hartley Act, the right to strike is not made absolute, nor is any other concerted activity given to a Union, or guaranteed to a Union, by virtue of this Act, made absolute.

What I think we must understand and remember is that prior to the Taft-Hartley Act, prior to the Wagner Act, there were many Courts in many states that said if men get together and organize collectively to engage in trying to get better wages or working conditions, that is a conspiracy and that can be stopped.

So to get at that and to protect the workers in their just and lawful concerted activity, be it a strike or other activities, the Labor Relations Acts have contained these guarantees of the right to strike and to engage in other concerted activity.

But it is evident from the decisions of the Supreme Court that this is not to be regarded nor has it been held to be an absolute sweeping, all encompassing, right. We can look at it in the light of two or three cases.

Wisconsin passed a law banning strikes in public utilities. There the law didn't make any exceptions. It said to a fellow working on a street-car line or in a gas plant up there in Milwaukee, or elsewhere, "You can't strike and we are going to give you compulsory arbitration in place of striking."

That was upheld by the Wisconsin Supreme Court. It went to the United States Supreme Court, and in Bus Employees v. Wisconsin Board, 340 U. S. 383 (1951) it was found to violate the protection of concerted activity, to-wit, the right to strike given under the Taft-Hartley Act and its forerunner, the Wagner Act.

So there, where there was a complete ban of concerted activity, it was found that the protection granted by the Act rendered such a State law illegal and void.

Recently we had another more precise illustration. A Kentucky State Court enjoined and, in fact, issued a mandatory injunction directing truck drivers to cross a picket line.

It grew out of a situation in a strike at the American Tobacco Company—not involving the American Tobacco Company as such, where Lucky Strikes are made, but a subsidiary called American Suppliers.

Employees of that plant, which was on the premises of the American Tobacco Company, were on strike, and there the employees of certain common carriers who hauled to and from American Tobacco, had to cross the picket line at this plant.

The actual contract which these truck drivers had, said they didn't have to cross the picket line. There was an express excuse given them against crossing such a picket line.

The Chancellor down in Kentucky and the Court of Appeals of Kentucky affirming him, 264 S. W. 2d 250 (1954), said that it doesn't make any difference, "You are a common carrier and you have got to haul." And, therefore, they issued a mandatory injunction directing these truck drivers to cross a picket line.

It is the first time I ever saw one like that. It went to the Supreme Court of the United States and was decided in the same term of Court as the Anheuser-Busch case, Weber v. Anheuser-Busch, 348 U. S. 468 (1954). And on the authority of the Anheuser-Busch case the Supreme Court, without an opinion, reversed the Kentucky Court, 348 U. S. 978 (1955). Now, I understand that to mean this, especially after I had read the decision of the Court of Appeals of Kentucky. I think, clearly, the Supreme Court of the United States says that the right given expressly by the Taft-Hartley Act, and I read that provision, must be upheld. And that is the provision in Section 8(b)(4)(D), which says this:

"Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer other than his own employer if employees of such employer are engaged in a strike ratified or approved by representatives of such em-

ployees whom such employer is required to recognize under this subchapter."

So in that situation it was held, apparently, because of this section that the truck drivers could not be put under mandatory restraint in order to cross that picket line. So there, specifically, is a right protected by the Act, and the Supreme Court said that any State Act which attempted to violate that must be held illegal.

As far as Weber v. Anheuser-Busch is concerned, the Supreme Court couldn't quite make up its mind whether this case involved an unfair labor practice situation, which the Board had dismissed, or whether it involved protected activity. But the Supreme Court, Justice Frankfurter speaking, wound up by saying, at Page 481:

"But where the moving party itself alleges unfair labor practices, where the facts reasonably bring the controversy within the sections prohibiting these practices, and where the conduct, if not prohibited by the Federal Act, may be reasonably deemed to come within the protection afforded by that Act, the State Court must decline jurisdiction in deference to the tribunal which Congress has selected for determining such issues in the first instance."

Yet it is equally true that in Auto Workers v. Wisconsin Board, 336 U. S. 245 the Supreme Court has ruled that neither Section 7 nor Section 13 of the Taft-Hartley Act confers an absolute right to engage in every kind of strike or other concerted activity. Specifically the Court held that recurrent or intermittent unannounced stoppages of work to win unstated ends are "neither forbidden by federal statute nor was it legalized and approved thereby." The Court therefore affirmed an order of the Wisconsin Employment Relations Board which ordered the Union and its members from instigating intermittent and unannounced work stoppages in the plants of any employer engaged in interstate commerce.

The last paragraph of the majority opinion is presently significant. At Page 265 the Court said: "We find no basis for denying to Wisconsin the power, in governing her internal affairs, to regulate a course of conduct neither made a right under federal law nor a violation of it and which has the coercive effect obvious in this device."

So then we come to apply these principles to the present case. It is the position of the Defendants that the picketing carried on at the Sohio Distribution Centers is not an unfair labor practice. I think that is an important point to make.

When the question was specifically put to counsel for the Union as to whether the picketing which had been going on there, under any possible interpretation, could be regarded as an unfair labor practice, he specifically and categorically said no. He conceded that the conduct which involved the picketing does not constitute and cannot constitute an unfair labor practice under the Taft-Hartley Act.

I think it should be interpolated at this point that if the purpose of this picketing was actually to substitute the Oil, Chemical and Atomic Workers as the bargaining agent in place of the Independent Petroleum Workers, if that was the real purpose of the picketing, it might very well

be argued that the picketing going on there would constitute an unfair labor practice under the Taft-Hartley Act.

But, after all, intent is an important element in picketing. And here the intent is lacking to make this an unfair labor practice. And, of course, it would follow that if this actually was intended, although denied here, then this Court under the Garner case would have to decline jurisdiction and take the position that the employer must seek his remedy in Washington.

Furthermore, it seems to me that we can summarize then by saying this does not constitute conduct prohibited by the Act nor does it constitute conduct protected by the Act. As I have said previously there is no absolute guarantee of the right to strike or to engage in concerted actvities.

As a matter of fact, research shows that the Congressional Committee, handling the Taft-Hartley Act on this question of enforcement of contracts said this, and I quote from their Committee report:

"Once parties have made a collective bargaining contract the enforcement of the contract should be left to the usual processes of the law and not to the National Labor Relations Board."

So it seems to me that there is clearly nothing in the Taft-Hartley Act which can be regarded as protecting concerted activities which have as their purpose possible and probable inducement of breach of contract. This conduct here, neither being prohibited by the Taft-Hartley Act nor protected by the Taft-Hartley Act, therefore, does not fall within any of the categories in which the Supreme Court has said a State Court may not act.

It has been ruled by the Supreme Court that even though a specific remedy exists under the Taft-Hartley Act to prevent violent picketing, nevertheless State Courts are not divested of their historic right to maintain the public peace.

Surely it must be equally true that where the Taft-Hartley Act provides no remedy against picketing which tends to induce a breach of contract the State Courts also retain their historic role to uphold and enforce valid existing contracts.

I think it is important to just mention two cases, without making any reference to them specially, which take a point of view which seems. to me, pretty clearly shows we have jurisdiction in this case. One is the case of **General Electric Company v. International Union, 93 Oh Ap 139** (1952). The other case is a decision of the Pennsylvania Supreme Court, a very recent decision rendered after the American Brake Shoe Case, . which has been bantered about and considered so much in this trial. That is the case of Philadelphia Marine Association v. Longshoremen, 382 Pennsylvania 326, 115A 2nd 419.

In short, we come to a situation which Justice Jackson referred to in the Garner case as being, "Either governable by the State or it is entirely ungoverned."

I think that is precisely what you have here. Therefore, it is my ruling on the first point in this case that this Court does have jurisdiction to act.

Coming then to the question of whether or not the evidence shows that the picketing which took place here induced a breach of contract as claimed by the Plaintiff:

The facts show that the picketing was authorized and commanded by the Defendants. It is also clearly established in the evidence that the picketing was directed at stopping the trucks, both by placing picket lines in the line of traffic, in and out of the Distribution Center, and by oral persuasion in arguing with each driver.

Thirdly, though incidentally it is true that the picketing may, perhaps, also have been aimed at those few members of the general public who hauled in and out of this plant, clearly, primarily, it was directed at Sohio truck drivers in an effort to get them to cease working.

I think the effect of this picketing is best illustrated by what happened on June 12th. At that time the picketing reached its highest volume when there were some 50 to 75 pickets, according to the evidence, at the entrance and exit of the Distribution Center. Operations were at a complete halt. Judge White issued a restraining order and it was served on the Defendants. Picketing ceased at 2:00 o'clock.

The order was explained to the truck driver members of the Independent Petroleum Workers, Inc., and immediately when the pickets ceased their activity the truck drivers went back to work.

Again, about 5:45, when a few pickets reappeared, operations stopped again. When those pickets were removed the truck drivers commenced operations again and have been continuing ever since.

So the direct relationship of cause and effect couldn't, I don't think, be any clearer than under these facts. Nor do I think it can be argued that though the Union is bound by Section 12, the so-called no-interruption-of-work, no-stoppage clause, that the members of the Union are not bound.

I think it is best demonstrated by the fact that in paragraph (b) of that section a worker who violates paragraph (a) is made subject to discipline, and clearly then the section applies to individual employees. As a matter of fact, a Union, after all, is its membership. It is the combination of all the members. It is seeking to get better wages, and better hours and better working conditions, and, clearly, if the employees derive the benefits from a Union contract then, surely, they are subject to the burdens of the Union contract.

If it were otherwise, it seems to me that Unions would be in the same kind of position, which some corporations get into by trying through separate corporate fictions to shed responsibility, and I am sure no Union wants to reach or take that position.

Then we come to the question of whether, since I do specifically find that there has been an inducement to breach this contract as a result of this picketing, whether or not under the public policy of this State such action is illegal.

I think Judge Hurd's opinion in Sterling & Welch Co. v. Duke et al., 67 N. E. 2d 24 (1946) must still be regarded as the pronouncement of the public policy of this State. It is about eleven years old. It has never been reversed or modified and it has been, on the other hand, referred to and quoted with approval by other Courts.

I think it clearly must be the public policy of any State to uphold and enforce contracts. If that weren't so, the very base of all of our relationships would disintegrate. Surely, Courts have to be regarded as the guardians of contracts. If a breach occurs a person files a lawsuit for damages. But, on the other hand, where a suit for damages is not an adequate remedy, Courts, historically, have stepped in and granted through equity protection against breaches of contract. This I take to be the law of Ohio.

I am not concerned with the law of Pennsylvania. I am enforcing the public policy and the law of Ohio. And if Pennsylvania, with its little Norris-LaGuardia Act, in a very sharply conflicting opinion of its Supreme Court in the American Brake Shoe Case, 373 Pa. 164 (1953), 94 A. 2d 884, found that under the anti-injunction act of that state, in a situation quite comparable to the one we have here, that an injunction could not issue and should not issue, all I can say is I am not bound by that decision because we don't have an anti-injunction act in this State. We must, therefore, be bound by the law I am bound to enforce.

I think it is interesting, though, to point out that in the case I mentioned to you a moment ago, Philadelphia Marine Association v. Longshoremen, the later decision of the Pennsylvania Supreme Court, they specifically say this about the question we have been dealing with. They say at Page 332:

"Prevention of violation of obligations contained in a contract by injunctive relief is a power traditionally exercised by courts of this commonwealth. Congress has not acted upon the specific subject matter at issue. Enforcement of contracts may be required according to the usual processes of the law."

That involved a breach, not of a third party contract, but of the actual contract between the employer and the employees. There they stepped in and enforced it.

Now, then, to quickly come to a conclusion in this case. If there were no contract covering the employees of the Sohio Distribution Center I think that under the decision of the Kentucky Court, the American Tobacco case, which was not reversed on one ground, and under decisions of other Courts, that it would be legitimate to maintain picketing even though the employees of this center were not directly involved in the labor dispute we are concerned with here. Because I think it is true that the Courts have upheld the right to picket facilities of the same employer in order to bring economic pressure to bear on that employer. But that, in my judgment, has to stop where a valid existing enforceable contract binds the employees of that particular unit to specific conduct and specifically prohibits a work stoppage and work interruptions.

Gentlemen, the last witness that testified in this case, I think gave us the problem just in a very clear nutshell, if you can think of a transparent nutshell. I am referring to Ralph H. Bloom, Jr.

He said, "Well, I was coming in to work. I had left work in the morning, after working all night, and I was coming back to work at 5:30, and I was coming in the gate, I don't know how many fellows were standing there, and a fellow said to me as I slowed down, 'Here comes another

scab, one of those God-damned scabs.' I said, 'What do you mean scab?' He said, 'You know what I mean,' I said, 'No sir, I don't know what you mean. After all, I am a Union man as well as you and I have a contract to live up to.' With that I took off.''

A labor agreement is necessarily the end result of the collective bargaining process. If labor relations are to prosper, and I am sure and hope that they will, then there must be mutual confidence in the sanctity of a labor agreement. And it works both ways. It works against employers as much as it must encompass Unions.

It seems to me that the agreement of the Independent Petroleum Workers, Inc. is entitled to the same kind of respect as the agreement, which I hope soon will be worked out between the Oil Workers and The Standard Oil Company.

You can't pick and choose between one and the other. If the shoe were on the other foot and the Petroleum Workers were on strike, and the Oil Workers had a contract, that contract would have to be respected by the Petroleum Workers. And the reverse is equally true.

Gentlemen, it seems to me under the circumstances that the request for injunctive relief to prevent, by picketing or other concerted activity, an inducement or any inducement to breach the Independent Petroleum Workers contract, must be sustained.

The temporary restraining order, I think, perhaps, will have to bear some rewording, but the basic point that we have been dealing with here, the question of whether a permanent injunction should be issued against picketing of whatsoever kind at the distribution centers must be answered yes. The temporary restraining order on that point must be made permanent.

Exceptions are noted, of course, to both sides.

Let me say this before I leave the bench. Now that I have concluded this role, I repeat what I said at the beginning of this matter. If this Court, working either in conjunction with the Federal Mediation Service or alone, can be of any value or any benefit at all in trying to bring this strike to an end, my services are ready and willing. Maybe not able, but at least willing.

### JOURNAL ENTRY

July 10, 1957.

This matter came on for hearing on June 24th, 27th, 28th, and 29th, and on July 1st, 1957, the cause having been advanced for hearing out of its regular order upon the motion of the defendants. The cause was heard upon the plaintiff's petition, the joint answer of the defendants (the affirmative matter contained in the first defense of said joint answer being by the parties treated as denied), the evidence and arguments of counsel presented both orally and in writing, and the motions for judgment made respectively by the parties at the conclusion of all the evidence.

After due consideration the Court finds that the defendants by

picketing at the premises hereinafter designated, and by engaging in other concerted activity, including but not limited to following tank trucks of the plaintiff on public streets and highways, have induced, and, unless permanently enjoined, will continue to induce, a breach of the agreement now in full force and effect between the plaintiff and Independent Petroleum Workers, Inc., and particularly Section 12 of said Agreement, which provides in part that during the life of the Agreement there shall be no interruptions or stoppages of work by Independent Petroleum Workers Union, Inc., through strikes, slowdowns, sitdowns or otherwise.

The Court further finds that said inducement to breach said Agreement is conduct which is neither prohibited by nor protected by the Federal law known as the Taft-Hartley Act, and further that said conduct is "either governable by the State or it is entirely ungoverned;" and

The Court further finds that said conduct of the defendants directly and proximately resulting, as it has, in an inducement to breach the aforesaid Agreement, is violative of and against the public policy of the State of Ohio; and therefore,

The Court finding that it has full jurisdiction to exercise its equitable powers under the circumstances of this case, the joint motion of the defendants for a dismissal of plaintiff's petition and for judgment is denied, and plaintiff's motion for judgment and its prayer for a permanent injunction, being well taken, are granted as hereinafter specified. Therefore,

IT IS ORDERED, ADJUDGED AND DECREED, That the defendants, and each of them, defendant labor organizations, their officers, agents, members and employees, and all other persons associated with or acting in concert with the said defendants, and all others to whom knowledge of this order shall come, be permanently enjoined:

1. From picketing, peacefully or otherwise, in any manner at or in the vicinity of the premises of the plaintiff designated as Sohio Distribution Center, 4800 East 49th Street, Cuyahoga Heights, Ohio; Sohio State Warehouse, 2941 East 34th Street, Cleveland, Ohio; Division Bulk Terminal, 3083 Broadway, Cleveland, Ohio; Noble Bulk Station, East Cleveland, Ohio; Brecksville Bulk Station, Brecksville, Ohio.

2. From interfering with plaintiff's officers, agents, representatives and employees, and from engaging in any concerted activity, which interference or concerted activity is for the purpose of inducing, or tending to induce, a breach of the Agreement which is now in full force and effect between the plaintiff and Independent Petroleum Workers, Inc., including but not limited to inducing employees of the plaintiff who are subject to said Agreement to cease work in violation of said Agreement.

3. From loitering, grouping, or congregating on or off the public street or highway at or in the vicinity of the entrances or exits of said designated premises.

4. From interfering in any manner with the ingress to or egress from said designated premises of trucks, cars, or other vehicles of any kind and from following them at hazardous or dangerous distances or in

a hazardous or dangerous manner, or from in any way limiting their freedom of movement, or from interfering with the operation of said vehicles on the public streets or highways, and from following them except at a safe and non-hazardous distance and only for the purpose of ascertaining customers of the plaintiff for the purpose of acquainting said customers with the dispute in a lawful manner.